# MINNESOTA *v.* NORTHERN SECURITIES COMPANY.

## ORIGINAL.

No. 10. Original.   Argued January 27, 1902.—Decided February 24, 1902.

Whether a bill in equity, filed in the name of a State, seeking to prevent by injunction a corporation organized under the laws of another State, with power to acquire and hold shares of the capital stock of any other corporation, from obtaining and exercising ownership and control of two or more competing railroad companies of the State, so as to evade and defeat its laws and policy forbidding the consolidation of such railroads when parallel and competing, is a controversy of which this court has jurisdiction.

The general rule in equity is that all persons materially interested, either legally or beneficially, in the subject-matter of a suit, are to be made parties to it; and the established practice of courts of equity to dismiss the plaintiffs' bill if it appears that to grant the relief prayed for would injuriously affect persons materially interested in the subject-matter who are not made parties to the suit, is founded upon clear reasons, and may be enforced by the court, *sua sponte*, though not raised by the pleadings, or suggested by counsel.

The bill discloses that the parties to be affected by the decision of this controversy are—directly the State of Minnesota, the Great Northern Railway Company, and the Northern Pacific Railway Company, corporations of that State, and the Northern Securities Company, a corporation of the State of New Jersey—and, indirectly, the stockholders and bondholders of those corporations, and of the numerous railway companies whose lines are alleged to be owned, managed or controlled by the Great Northern and Northern Pacific Railway Companies; and it is obvious that the rights of the minority stockholders of the two railroad companies are not represented by the Northern Securities Company.

When it appears to a court of equity that a case, otherwise presenting ground for its action, cannot be dealt with because of the absence of essential parties; and it further appears that necessary and indispensable parties are beyond the reach of the jurisdiction of the court, or that, as in this case, when made parties, the jurisdiction of the court will thereby be defeated, it would be useless for the court to grant leave to amend.

On the 7th day of January, 1902, came the State of Minnesota, by Wallace B. Douglas, its Attorney General, and moved the court for leave to file a bill of complaint against the Northern Securities Company, a corporation of the State of New

Jersey. Thereupon the court directed that notice of such application should be given to the defendant, and set the motion for argument on January 27, 1902, when it was duly heard.

The bill proposed to be filed was in the following terms:

*To the Judges of the Supreme Court of the United States of America:*

Your oratrix, the State of Minnesota, complainant, by Wallace B. Douglas, Attorney General thereof, brings this its bill of complaint against the Northern Securities Company, a corporation organized under and by virtue of the laws of the State of New Jersey, and alleges:

### I.

That by an act of Congress, entitled "An act for the admission of Minnesota into the Union," approved May 11, A. D. 1858, the said State of Minnesota was admitted into the Union upon an equal footing with the original States.

### II.

That said Northern Securities Company is a corporation organized as hereinafter alleged, under and by virtue of the laws of the State of New Jersey, and is a citizen of the State of New Jersey.

### III.

### A.

That by an act of the Congress of the United States, of March 12, 1860, extending to the State of Minnesota the swamp lands grant theretofore made to the State of Arkansas, and by various subsequent acts, the Congress of the United States donated to the State of Minnesota from the public domain large quantities of lands situated within the State of Minnesota, and of the value of several millions of dollars. That the State of Minnesota now has left and undisposed of more than three million acres of said lands, of the value of more than fifteen million dollars, much of which said land is located in the territory traversed by the railroads of the Great Northern and Northern Pacific Railway Companies, as hereinafter alleged. That the value of said land, and the salability thereof, depends

in very large measure upon having free, uninterrupted and open competition in passenger and freight rates over the lines of railway owned and operated by said Great Northern and Northern Pacific Railway Companies.

That many of said lands are vacant and unsettled and located in regions not at present reached by railway lines, and depend for settlement upon the construction of lines in the future; that it has heretofore been the practice of said Great Northern and Northern Pacific Railway Companies, respectively, to extend spur lines into territory adjacent to each of said roads, as well as into new territory, for the purpose of developing such territory, as well as to obtain traffic therefrom; that such new lines have been built in the past very largely by reason of the rivalry heretofore existing between said companies, for existing, as well as new business; that under the consolidation and unity of control hereinafter set forth, such rivalry will cease, and many of the lands now owned by the State of Minnesota will not be reached by railroads for years to come, if at all, owing to such combination and consolidation removing all rivalry and competition between said companies; that the settlement and occupation of said lands will add very much to their value, and such occupation will depend entirely upon the accessibility of railway lines and transportation facilities for marketing the products raised thereon; that if said lands are sold and become occupied, they will add very largely to the taxable value of the property of the State, and that said lands cannot be sold or the income of the State increased thereby without the construction of railroad lines to, or adjacent to, the same.

### B.

That the State of Minnesota is now and for many years past has been the owner of, and continuously maintained, an educational institution for the benefit of its citizens, known as the University of Minnesota; also a large number of hospitals for the insane, within its territorial limits; also five normal schools for the education of teachers within the State; also a state training school for boys and girls; also several state schools for the education, care and maintenance of the deaf, dumb,

blind and feeble-minded; also a state school for indigent and homeless children; also a state penitentiary and reformatory.

That for many years past the State of Minnesota has continuously maintained and supported each of said institutions, and in the care, maintenance and management thereof has been compelled to and in the future, of necessity, will annually purchase large quantities of supplies for said institutions, including provisions, clothing and fuel, a great portion of which the State of Minnesota is compelled to ship over the different lines of railway owned and operated by the Northern Pacific Railway Company and the Great Northern Railway Company.

That the State of Minnesota is compelled to expend annually more than seven hundred thousand dollars in the operation and maintenance of said public institutions, most of which sum is raised by general taxation upon the lands and other property of the citizens of the State of Minnesota, and situated therein. That the amount of taxes which said State of Minnesota can collect, and the successful maintenance of its said public institutions, as well as the performance of its governmental functions and affairs, depends largely upon the value of the real and personal property situated within its territorial limits, and the general prosperity and business success of its citizens. That the value of said real and personal property of the citizens of the State of Minnesota, as well as their business success and general prosperity, depend very largely upon maintaining in said State free, open and unrestricted competition between the railway lines of said Great Northern and Northern Pacific Railway Companies respectively within said State.

C.

That it has been the settled policy and practice of the State of Minnesota since its organization as a Territory to develop the resources of the State by encouraging railroad building therein, and in furtherance of this policy the Territory of Minnesota, by an act thereof, under the date of May 22, 1857, granted to the Minnesota and Pacific Railroad Company a charter, and in consideration of the construction and maintenance of a line of railway in Minnesota, by said company, said Territory do-

nated to it out of its public domain about seven hundred thousand acres of land. That said Minnesota and Pacific Railroad Company thereafter became insolvent, and all its property was placed in the hands of a receiver; that such proceeding were thereafter had that all the property of the last named company, including said land, was duly sold and conveyed to the St. Paul, Minneapolis and Manitoba Railway Company, hereinafter mentioned.

That the State of Minnesota, by an act of its legislature, and in consideration of the construction and maintenance of a line of railway by the Great Northern Railway Company, hereinafter referred to, between St. Cloud and Hinckley, a distance of eighty-four miles, donated and conveyed to said last named company upwards of four hundred thousand acres of land then owned by and situated in the State of Minnesota, which said land was then worth more than one million dollars. That in carrying out said policy, and in aid of the building of railways within the State of Minnesota, there has been granted out of the public domain within the limits of the State of Minnesota upwards of 10,500,000 acres of land, nearly all of which has been granted to said Great Northern and Northern Pacific Railway Companies, and the subsidiary companies owned and controlled by them.

### D.

That by an act of the legislature of the State of Minnesota, approved March 3, 1881, entitled "An act granting swamp lands to aid in the construction of the main line of the road of the Little Falls and Dakota Railway Company," and which now is a part of the Northern Pacific Railway Company system, hereinafter referred to, the State of Minnesota donated to said Little Falls and Dakota Railway Company two hundred and forty-three thousand five hundred and ninety-one (243,591) acres of land situated in and then belonging to said State, in consideration of the construction and maintenance by said last named railway company of a line of railway extending from Little Falls to Morris, in the State of Minnesota.

### IV.

Your oratrix further alleges that immense quantities of wheat

and other products are shipped annually from East Grand Forks, Crookston, Moorhead, Fergus Falls and other competitive points within the State of Minnesota, and all on the lines of railway of the said Great Northern and Northern Pacific Railway Companies, hereinafter referred to, to the cities of Duluth, St. Paul and Minneapolis, within the State of Minnesota. That nearly all of the shipment of such products made from the above named initial points are consigned to various citizens at either the city of Duluth, St. Paul or Minneapolis over one or the other of said lines of railroad last above named. That enormous quantities of merchandise have been and will continue to be shipped annually over said lines of railway, between the cities of St. Paul and Minneapolis and various other cities and villages along said lines of railway situated within the State of Minnesota, and which are purchased and used entirely by the people of said State. That the competition in both freight and passenger traffic to and from said places has always been sharp and active between said railway companies, and has secured to the residents of said cities, as well as the State of Minnesota, and to the State of Minnesota itself, much lower rates for both freight and passengers than would otherwise have been obtained, or than will or can be obtained in case the consolidation or unity of control and management of said Great Northern and Northern Pacific Railway Companies, hereinafter alleged, is not enjoined as herein prayed.

## V.

That the Great Northern Railway Company is a corporation organized and existing under and by virtue of the laws of the State of Minnesota, to wit, under an act duly passed by the Territory of Minnesota, entitled "An act to incorporate the Minneapolis and St. Cloud Railroad Company," approved March first, A. D. 1856, and various subsequent acts of the State of Minnesota amendatory thereof and supplemental thereto, respectively entitled as follows:

"An act to amend an act entitled 'An act to incorporate the Minneapolis and St. Cloud Railroad Company,' passed March 1, 1856." Approved February 23, 1864.

" An act of the legislature of the State of Minnesota entitled
' An act granting swamp lands to aid the Minneapolis and St.
Cloud Railroad Company in building branches to connect with
the Lake Superior and Mississippi Railroad and the Winona
and St. Peter, or any other railroad in southern Minnesota.' "
Approved February 11, 1865.

" An act to amend an act entitled ' An act to incoporate the
Minneapolis and St. Cloud Railroad Company,' approved
March 1, 1856, and to repeal certain portions of an act amend-
ing the charter of said company, passed February 23, 1864."
Approved February 28, 1865.

" An act to amend an act entitled ' An act granting swamp
lands to aid the Minneapolis and St. Cloud Railroad Company
in building branches to connect with the Lake Superior and
Mississippi Railroad and Winona and St. Peter Railroad, or any
other railroad in Southern Minnesota.' "    Approved March 5,
1869.

" An act to amend the charter of the Minneapolis and St.
Cloud Railroad Company."    Approved March 6, 1869.

" An act to amend the charter of the Minneapolis and St.
Cloud Railroad Company."    Approved March 2, 1870.

" An act to extend the time for the construction and comple-
tion of the branch of the Minneapolis and St. Cloud Railroad
Company."    Approved March 11, 1879.

" An act to amend an act entitled ' An act granting swamp
lands to aid the Minneapolis and St. Cloud Railroad Company
in building branches to connect with the Lake Superior and
Mississippi Railroad and the Winona and St. Peter Railroad, or
any other railroad in southern Minnesota,' approved Febru-
ary 11, in the year of our Lord one thousand eight hundred and
sixty-five, as amended."    Approved March 10, 1885.

That on the 16th day of September, 1889, the corporate name
of said company was duly changed to the Great Northern Rail-
way Company.    That during the year 1889 said railway com-
pany caused to be constructed a line of railway extending from
St. Cloud, Minnesota, to Hinckley, Minnesota, which line was
immediately conveyed to the St. Paul, Minneapolis and Mani-
toba Railway Company, a corporation duly organized and exist-

ing under and by virtue of the laws of the State of Minnesota, hereinafter referred to_as the Manitoba Company. That said Manitoba Company, prior to the first day of February, 1890, had built, purchased and put in operation various lines of railway within the State of Minnesota, as well as in the States of North Dakota, Montana, Idaho and Washington, connecting by rail the cities of St. Paul and Minneapolis, within the State of Minnesota, and various other cities and villages within said State, with each other, and with Puget Sound, on the Pacific Ocean; which said railways are hereinafter more particularly described.

That on the first day of February, 1890, said Manitoba Railway Company leased to the said Great Northern Railway Company, for a period of nine hundred and ninety-nine years, all of the lines of railway, including the rolling stock then owned and controlled by said Manitoba Company; that ever since said last named date said Great Northern Railway Company has continued to and now does control, operate and maintain each and all of said lines as one complete railroad system. That said lines of railway so constructed by said Manitoba Company and now so controlled, operated and maintained by said Great Northern Railway Company under said lease, are described as follows:

A line of railway extending from St. Paul, Minnesota, via Minneapolis, Elk River, St. Cloud, Sauk Center, Fergus Falls, Glyndon, Crookston to the northern boundary line of the State of Minnesota at St. Vincent.

Another line of railway extending from Minneapolis, Minnesota, along the western bank of the Mississippi River to St. Cloud, Minnesota.

Another line of railway extending from St. Cloud easterly to Hinckley, Minnesota.

Another line of railway extending from Elk River, Minnesota, northward to Malaco, Minnesota, on the line of the St. Cloud and Hinckley Branch, last above referred to.

Another line of railway extending from Minneapolis, Minnesota, to Breckenridge, Minnesota.

Another line extending from Sauk Center, Minnesota, to Park Rapids, Minnesota.

Another line of railway extending from Hutchinson Junction to Hutchinson, Minnesota.

Another line of railway extending from Benson, Minnesota, thence in a westerly direction to the western boundary line of the State; thence to Watertown, South Dakota.

Another line of railway extending from Evansville, Minnesota, westerly to the state boundary line, thence to Ellendale, North Dakota.

Another line of railway extending from Moorhead, Minnesota, westerly to the state boundary line; thence to Wahpeton, North Dakota.

Another line of railway extending from Moorhead, Minnesota, to Crookston, Minnesota.

Another line of railway extending from Barnesville, Minnesota, to Moorhead, Minnesota.

Another line of railway extending from Carman, Minnesota, to Foster, Minnesota.

Another line of railway extending from Crookston, Minnesota, to Red Lake Falls and Thief River Falls, Minnesota.

All of the foregoing lines being situated in the State of Minnesota, except as hereinafter otherwise expressly stated.

That said Great Northern Railway Company now either owns or controls, and operates and maintains, by virtue of said lease, a line or system of railways connecting with said lines above referred to, and extending from the western boundary line of the State of Minnesota through the States of North Dakota, Montana, Idaho and Washington, to Puget Sound on the Pacific Coast. The said railway lines covered by said lease, or owned by said Great Northern Railway Company, aggregate a total of about four thousand five hundred miles.

That many of said railroads above described being located within the State of Minnesota, were built by subsidiary companies or corporations, and said Great Northern Railway Company now owns all of the capital stock of such corporations in addition and as supplemental to said lease; and in addition thereto said Great Northern Railway Company owns all of the capital stock of the Eastern Railway Company of Minnesota, a corporation organized under the laws of the State of Minne-

sota, and which owns and operates a railway line extending from the cities of St. Paul and Minneapolis to Duluth, Minnesota; and from Duluth, Minnesota, to Bemidji, Minnesota; and by virtue of such ownership of stock said Great Northern Railway Company dictates the policy of said railway company and controls the lines of railway and properties of said Eastern Railway Company, and operates the same as a part of the Great Northern system of railway.

That said Great Northern Railway Company also owns all of the capital stock of the Willmar and Sioux Falls Railroad Company, a corporation owning a railroad extending from Willmar, Minnesota, to Yankton, South Dakota, and by virtue of such ownership of stock dictates the policy of and owns and controls the railway line and property of said Willmar and Sioux Falls Railroad Company.

That all of the railways and railway lines hereinbefore described are operated and controlled by and form a complete system under the name of said Great Northern Railway Company.

That the charter of said Great Northern Railway Company provides as follows: "That all of the affairs and business of said company shall be conducted by or under the direction of a board of directors, and they are authorized, for the purposes specified in this act, to make and establish regulations and by-laws, and to do all things necessary to be done and not inconsistent with the Constitution and laws of the United States, or the laws of this Territory, or this act."

Your oratrix further alleges that the board of directors of said Great Northern Railway Company, at the time of the organization of the Northern Securities Company, hereinafter referred to, to wit, on or about the 13th day of November, 1901, was and now is composed of the following named persons, to wit: James J. Hill, James N. Hill, Samuel Hill, William P. Clough, Edward Sawyer, M. D. Grover, Jacob H. Schiff and Henry W. Cannon; and at said date the managing or executive officers of said corporation were and now are as follows: President, James J. Hill; Vice President, William P. Clough; Secretary and Assistant Treasurer, E. T. Nichols. That on

said last named date said Great Northern Railway Company had issued, and there was then outstanding, a total of one hundred and twenty-five million dollars, par value, of the capital stock of said corporation, and your oratrix is informed and believes, and upon information and belief alleges, that said James J. Hill was on said last named date the owner of or in possession and control of, or had subject to his direction and disposition, more than a majority of said capital stock so outstanding.

## VI.

That the Northern Pacific Railway Company was formerly a corporation organized and existing under and by virtue of an act of the Congress of the United States, entitled, "An act granting land to aid in the construction of a railroad and telegraph line from Lake Superior to Puget Sound on the Pacific Coast, by the northern route," approved July 2, 1864; and a joint resolution of Congress extending the time for the completion of said railroad until July 1, 1868; and a joint resolution granting the consent of Congress provided for in section ten of said act, incorporating the Northern Pacific Railroad Company, approved March 1, 1869; the joint resolution of Congress granting the right of way for the construction of a railroad from Portland, Oregon, to a point west of the Cascade Mountains in Washington Territory, approved April 1, 1869; the joint resolution of Congress authorizing the Northern Pacific Railroad Company to issue its bonds for the construction of its road, and to secure the same by mortgage, and for other purposes, approved May 31, 1870. And complainant asks leave to refer to and have each of said acts and resolutions considered as though fully herein set forth.

That under and in pursuance of the said several acts and joint resolutions of Congress, the Northern Pacific Railroad Company constructed and put into operation, prior to January 1, 1890, all of its main line of road, extending from Ashland, in the State of Wisconsin, westward across the States of Minnesota, North Dakota, Montana and Idaho, and in the State of Washington to Walla Walla Junction; also all that other part of its main line of railroad extending from Portland,

Oregon, to Tacoma, Washington; also the whole of its Cascade Branch, extending from Pasco Junction, in the State of Washington, to Tacoma, in the State of Washington.

That said Northern Pacific Railroad Company had also, prior to said first day of January, 1880, acquired and then owned all of the capital stock of the following named railroad companies and corporations, to wit, the St. Paul and Northern Pacific Railroad Company, a corporation organized under the laws of the State of Minnesota, and which then owned a railroad extending from St. Paul, Minnesota, to Brainerd, Minnesota; and from Little Falls, Minnesota, to Staples, Minnesota; also of the Duluth and Manitoba Railroad Company, a corporation organized under the laws of the State of Minnesota, and which then owned a line of railroad extending from Winnipeg Junction, Minnesota, via Red Lake Falls, Minnesota, to the western boundary line of said State, and thence to Grand Forks, North Dakota; and thence to the international boundary line between the state of North Dakota and Canada; also of the Duluth, Crookston and Northern Railroad Company, a corporation organized under the laws of the State of Minnesota, and which then owned a railroad extending from Fertile Junction, Minnesota, through Crookston to Carthage Junction, Minnesota; also of the Little Falls and Dakota Railroad Company, a corporation organized under the laws of the State of Minnesota, and which then owned a railroad extending from Little Falls, Minnesota, to Morris, Minnesota; also of the Northern Pacific, Fergus Falls and Black Hills Railroad Company, a corporation organized under the laws of the State of Minnesota, and which owned a line of railroad extending from Wadena, Minnesota, thence westerly to the western boundary line of the State; and thence to North Dakota points; also all of the capital stock of various railroad corporations or companies organized in the States of North Dakota, South Dakota, Montana and Washington, which owned and operated various railway lines in said States respectively. The said railway lines built by said companies within the State of Minnesota, as well as those built outside of the State of Minnesota, and the capital stock of the corporations so building said lines, and

owned by said Northern Pacific Railroad Company, as hereinbefore alleged, were operated, managed and controlled by said Northern Pacific Railroad Company as a system of railway or railways extending from and between various points in the State of Minnesota, more specifically hereinafter referred to, through said State and thence to the Pacific Coast; and aggregate about four thousand five hundred miles of railway.

## VII.

That the Northern Pacific Railway Company is now and for upwards of five years last past has been a corporation organized under and by virtue of the laws of the State of Wisconsin; said corporation being organized during the year 1895. That thereafter and prior to the time said Northern Pacific Railway Company became possessed of and the owner of the railway lines and property formerly owned and operated by said Northern Pacific Railroad Company, said Northern Pacific Railway Company filed with the Secretary of State of the State of Minnesota, in accordance with the terms and provisions of the laws of said State of Minnesota, a duly authenticated and certified copy of its articles of incorporation, and thereupon said Northern Pacific Railway Company became a corporation of and within the State of Minnesota, and subject to all of the laws, regulations and provisions of said State of Minnesota relating to railway or railroad corporations, including those acts or parts of acts hereinafter specifically pleaded or referred to.

That under the charter or articles of incorporation of said Northern Pacific Railway Company the powers of said company are delegated to and exercised by a board of fifteen directors; that during the month of April, 1901, the following-named persons constituted and now are the members of the board of directors of said last named company: James J. Hill, Robert Bacon, George F. Baker, E. H. Harriman, H. McK. Twombly, Brayton Ives, D. Willis James, John S. Kennedy, Daniel S. Lamont, Charles S. Mellen, Samuel Rea, William Rockefeller, Charles Steele, James Stillman and Eben B. Thomas. That on the 13th day of November, 1901, J. Pierpont Morgan, with certain other persons to your oratrix unknown, but who

were acting with said Morgan, owned and had in their possession, or held under and subject to their control and disposition, upwards of eighty-five per cent of the total capital stock of said Northern Pacific Railway Company then outstanding. That the total amount of capital stock of said Northern Pacific Railway Company then issued and outstanding amounts to one hundred and fifty-five millions of dollars, par value, seventy-five millions of dollars of which was preferred stock, subject to retirement as provided by the articles of incorporation and agreement under which the same was issued.

That during the year 1893 the said Northern Pacific Railroad Company became insolvent, and all of the property of said last named company, of whatever kind or character, was duly placed in the hands of receivers appointed for that purpose by the Circuit Court of the United States for the Eastern District of Wisconsin; and thereafter, in proceedings ancillary thereto, by the various Circuit Courts of the United States in whose jurisdictions said property was located. That after said Northern Pacific Railway Company had filed its said articles of incorporation in the State of Minnesota and had become subject to its laws, and during the year 1896, said Northern Pacific Railway Company duly purchased and became the owner of the entire railroad properties and railway lines, including the right of way, rolling stock and capital stock, formerly owned by said Northern Pacific Railroad Company; and immediately thereafter entered into the possession thereof; and at all times since has continuously owned and operated each and all of the said lines of railway so situated within the State of Minnesota, and which connect the cities of St. Paul and Minneapolis and Duluth, and various other villages and cities within the State of Minnesota, and connect with the lines of railway outside of said State of Minnesota.

That during the year 1899 said Northern Pacific Railway Company purchased, and ever since has owned and operated, a line of railway extending from the cities of St. Paul and Minneapolis to Duluth, Minnesota; that said last named line parallels and is a competing line of railway for both freight and passenger traffic with the line of railway between said

Minneapolis and St. Paul and Duluth, hereinbefore described, and which is owned by said Eastern Railway Company of Minnesota, but operated, controlled and managed by said Great Northern Railway Company as a part of the system of said last named company, as hereinbefore alleged.

That the lines of railway now owned and operated by said Great Northern Railway Company within the State of Minnesota are parallel and competing lines for freight and passenger traffic with the lines of railway now owned, operated and controlled by said Northern Pacific Railway Company within the State of Minnesota, between the following points in said State, to wit: The cities of St. Paul and Minneapolis and the city of Duluth, Minnesota, and the various cities and villages between said points; also between the cities of St. Paul and Minneapolis and Crookston, Minnesota, by way of Fergus Falls and the various cities and villages between said points; also between the cities of St. Paul and Minneapolis and Crookston by way of Breckenridge, and the towns and cities between said points; and also between the cities of Duluth and Crookston, and the cities and villages between said points, as well as the country adjacent to the lines of railway between each and all of said cities; and the said lines of railway owned, operated and controlled by said Great Northern Railway Company, and also the lines of railway owned, operated and controlled by said Northern Pacific Railway Company which connect with the said lines of railway owned, operated and controlled by each of said companies respectively within the State of Minnesota, are parallel and competing lines through the States of North Dakota, Montana, Idaho and Washington to Puget Sound on the Pacific Coast for passenger and freight traffic. That during all of the time aforesaid each and all of said lines of railway were maintained and operated by said respective companies as common carriers of freight and passengers within the State of Minnesota; and that said companies are now, and for upwards of eleven years last past have been, the only railway companies owning or operating lines of railway crossing the State of Minnesota and connecting the Pacific Ocean by rail with points in Minnesota; also the only lines of railway traversing east and west

the northern tier of States of the United States lying west of the Mississippi River, and connecting such territory and territory tributary thereto by rail with the Pacific Ocean; and, with one exception, the only lines of railway crossing the north half of the State of Minnesota in any direction.

## VIII.

That the Chicago, Burlington and Quincy Railway Company is and, for many years last past has been, a corporation duly organized and existing under and by virtue of the laws of the State of Illinois; and, as such, until the disposition of its capital stock as hereinafter alleged, owned, operated and controlled an extensive system of railway lines extending from the city of Chicago, in the State of Illinois, in a westerly direction to the city of Denver, in the State of Colorado; and also in a westerly and northwesterly direction from said city of Chicago, to the city of Billings, in the State of Montana; which last named point is a junction and competitive point for freight and passenger traffic with the said Northern Pacific Railway Company; and also from said city of Chicago to the cities of St. Paul and Minneapolis, in the State of Minnesota; and in addition to said main lines, owned, operated and controlled a large number of connecting and tributary lines, extending to various cities and towns in the States of Illinois, Iowa, Missouri, Wisconsin, Minnesota, Nebraska, Kansas, Wyoming and Montana. That the total mileage of said railway company is approximately seven thousand four hundred miles. That during the year 1901 the said Great Northern Railway Company and said Northern Pacific Railway Company jointly purchased ninety-eight per cent of the total capital stock of said Chicago, Burlington and Quincy Railway Company, aggregating approximately one hundred and seven millions of dollars, par value, and now own the same; and issued in payment therefor the joint bonds of said Great Northern and Northern Pacific Railway Companies, payable in twenty years from the date thereof, and bearing interest at the rate of four per cent per annum, payable semi-annually. That said Great Northern and Northern Pacific Railway Companies issued and delivered in exchange for each

one hundred dollars in amount of said Chicago, Burlington and Quincy Railway Company stock two hundred dollars in amount of the said bonds.

That under and by virtue of the purchase of said stock the joint ownership and control of the said Chicago, Burlington and Quincy Railway Company is vested in and ever since has been exercised by the said Great Northern and Northern Pacific Railway Companies.

### IX.

That the defendant Northern Securities Company is a corporation organized, existing and doing business under and by virtue of the laws of the State of New Jersey. That said corporation was organized on the 13th day of November, A. D. 1901, with its principal office for the transaction of its business located at the city of Hoboken, county of Hudson and State of New Jersey, and is a citizen of the State of New Jersey.

That the articles of incorporation of said Northern Securities Company are as follows:

CERTIFICATE OF INCORPORATION

OF

NORTHERN SECURITIES COMPANY.

STATE OF NEW JERSEY, *ss :*

We, the undersigned, in order to form a corporation for the purposes hereinafter stated, under and pursuant to the provisions of the act of the legislature of the State of New Jersey, entitled "An act concerning corporations (Revision of 1896), and the acts amendatory thereof and supplementary thereto," do hereby certify as follows:

First. The name of the corporation is Northern Securities Company.

Second. The location of its principal office in the State of New Jersey is at No. 51 Newark street, in the city of Hoboken, county of Hudson. The name of the agent therein, and in charge thereof, upon whom process against the corporation may be served, is Hudson Trust Company. Such office is to be the registered office of the corporation.

Third. The objects for which the corporation is formed are:

(1) To acquire by purchase, subscription or otherwise, and to hold as investment, any bonds or other securities or evidences of indebtedness, or any shares of capital stock created or issued by any other corporation or corporations, association or associations, of the State of New Jersey, or of any other State, Territory or country.

(2) To purchase, hold, sell, assign, transfer, mortgage, pledge, or otherwise dispose of, any bonds or other securities or evidences of indebtedness created or issued by any other corporation or corporations, association or associations, of the State of New Jersey, or of any other State, Territory or country, and, while owner thereof, to exercise all the rights, powers and privileges of ownership.

(3) To purchase, hold, sell, assign, transfer, mortgage, pledge, or otherwise dispose of, shares of the capital stock of any other corporation or corporations, association or associations, of the State of New Jersey, or of any other State, Territory or country ; and, while owners of such stock, to exercise all the rights, powers and privileges of ownership, including the right to vote thereon.

(4) To aid in any manner any corporation or association of which any bonds, or other securities or evidences of indebtedness or stock are held by the corporation; and to do any acts or things designed to protect, preserve, improve or enhance the value of any such bonds or other securities or evidences of indebtedness or stock.

(5) To acquire, own and hold such real and personal property as may be necessary or convenient for the transaction of its business.

The business or purpose of the corporation is from time to time to do any one or more of the acts and things herein set forth.

The corporation shall have power to conduct its business in other States and in foreign countries, and to have one or more offices out of this State, and to hold, purchase, mortgage and convey real and personal property out of this State.

Fourth. The total authorized capital stock of the corporation is four hundred million dollars ($400,000,000), divided into four

million (4,000,000) shares of the par value of one hundred dollars ($100) each.   The amount of the capital stock with which the corporation will commence business is thirty thousand dollars.

Fifth. The names and post-office addresses of the incorporators, and the number of shares of stock subscribed for by each (the aggregate of such subscriptions being the amount of capital stock with which this company will commence business) are as follows:

| Name and post office address. | Number of shares. |
|---|---|
| George F. Baker, Jr., 258 Madison avenue,......... New York, New York. | 100 |
| Abram M. Hyatt, 214 Allen avenue,.............. Allenhurst, New Jersey. | 100 |
| Richard Trimble, 53 East Twenty-fifth street,...... New York, New York. | 100 |

Sixth. The duration of the corporation shall be perpetual.

Seventh. The number of directors of the corporation shall be fixed from time to time by the by-laws; but the number, if fixed at more than three, shall be some multiple of three.   The directors shall be classified with respect to the time for which they shall severally hold office by dividing them into three classes, each consisting of one third of the whole number of the board of directors.   The directors of the first class shall be elected for a term of one year; the directors of the second class for a term of two years; and the directors of the third class for a term of three years; and at each annual election the successors to the class of directors whose terms shall expire in that year shall be elected to hold office for the term of three years, so that the term of office of one class of directors shall expire in each year.

In case of any increase of the number of directors the additional directors shall be elected as may be provided in the by-laws, by the directors or by the stockholders at an annual or special meeting, and one third of their number shall be elected for the then unexpired portion of the term of the directors of the first class, one third of their number for the unexpired por-

tion of the term of the directors of the second class, and one third of their number for the unexpired portion of the term of the directors of the third class, so that each class of directors shall be increased equally.

In case of any vacancy in any class of directors through death, resignation, disqualification or other cause, the remaining directors, by affirmative vote of a majority of the board of directors, may elect a successor to hold office for the unexpired portion of the term of the director whose place shall be vacant, and until the election of a successor.

The board of directors shall have power to hold their meetings outside the State of New Jersey at such places as from time to time may be designated by the by-laws, or by resolution of the board. The by-laws may prescribe the number of directors necessary to constitute a quorum of the board of directors, which number may be less than a majority of the whole number of the directors.

As authorized by the act of the legislature of the State of New Jersey passed March 22, 1901, amending the seventeenth section of the act concerning corporations (Revision of 1896), any action which theretofore required the consent of the holders of two thirds of the stock at any meeting after notice to them given, or required their consent in writing to be filed, may be taken upon the consent of, and the consent given and filed by, the holders of two thirds of the stock of each class represented at such meeting in person or by proxy.

Any officer elected or appointed by the board of directors may be removed at any time by the affirmative vote of a majority of the whole board of directors. Any other officer or employé of the corporation may be removed at any time by vote of the board of directors, or by any committee or superior officer upon whom such power of removal may be conferred by the by-laws, or by vote of the board of directors.

The board of directors, by the affirmative vote of a majority of the whole board, may appoint from the directors an executive committee, of which a majority shall constitute a quorum ; and to such extent as shall be provided in the by-laws, such committee shall have and may exercise all or any of the powers of

board of directors, including power to cause the seal of the corporation to be affixed to all papers that may require it.

The board of directors may appoint one or more vice presidents, one or more assistant treasurers, and one or more assistant secretaries; and, to the extent provided in the by-laws, the persons so appointed respectively shall have and may exercise all the powers of the president, of the treasurer, and of the secretary, respectively.

The board of directors shall have power from time to time to fix and to determine and to vary the amount of the working capital of the corporation; to determine whether any, and if any, what part of any accumulated profits shall be declared in dividends and paid to the stockholders; to determine the time or times for the declaration and the payment of dividends; and to direct and to determine the use and disposition of any surplus or net profits over and above the capital stock paid in; and in its discretion the board of directors may use and apply any such surplus or accumulated profits in purchasing or acquiring its bonds or other obligations, or shares of the capital stock of the corporation, to such extent and in such manner and upon such terms as the board of directors shall deem expedient; but shares of such capital stock so purchased or acquired may be resold, unless such shares shall have been retired for the purpose of decreasing the capital stock of the corporation to the extent authorized by law.

The board of directors from time to time shall determine whether and to what extent, and at what times and places, and under what conditions and regulations, the accounts and books of the corporation, or any of them shall be open to the inspection of the stockholders, and no stockholder shall have any right to inspect any account or book or document of the corporation, except as conferred by statute of the State of New Jersey, or authorized by the board of directors or by a resolution of the stockholders.

The board of directors may make by-laws, and, from time to time, may alter, amend or repeal any by-laws; but any by-laws made by the board of directors may be altered or repealed by the stockholders at any annual meeting, or at any special

meeting, provided notice of such proposed alteration or repeal be included in the notice of the meeting.

In witness whereof, we have hereunto set our hands and seals, the twelfth day of November, 1901.

| | |
|---|---|
| GEORGE F. BAKER, JR. | (L. S.) |
| ABRAM M. HYATT. | (L. S.) |
| RICHARD TRIMBLE. | (L. S.) |

Signed, sealed and delivered in presence of—

GEORGE HOLMES.

STATE OF NEW YORK, }
COUNTY OF NEW YORK, } ss.:
MANHATTAN, }

Be it remembered, that on this twelfth day of November, 1901, before the undersigned, personally appeared George F. Baker, Junior, Abram M. Hyatt, Richard Trimble, who, I am satisfied, are the persons named in and who executed the foregoing certificate, and I, having first made known to them, and to each of them, the contents thereof, they did each acknowledge that they signed, sealed and delivered the same as their voluntary act and deed. GEORGE HOLMES,

*Master in Chancery of New Jersey.*

Endorsed: "Received in the Hudson Co., N. J., Clerk's office, Nov. 13, A. D. 1901, and recorded in Clerk's Record, No. ——, on page ——. Maurice J. Stack, Clerk. Filed Nov. 13, 1901, George Wurts, Secretary of State."

That said Northern Securities Company was incorporated at the instigation and request, and under the direction of James J. Hill and William P. Clough, and certain other stockholders of said Great Northern Railway Company to your oratrix unknown, who were coöperating with said James J. Hill and William P. Clough, and who, with said Hill and Clough, owned and controlled, or have the disposition and management, as hereinafter alleged, of a very large majority of the capital stock of said Great Northern Railway Company; and J. Pierpont Morgan and certain other stockholders of said Northern Pacific Railway Company, to your oratrix unknown, who were coöperating with said Morgan, and who, with said Morgan,

owned and controlled, or have the disposition and management of, a very large majority of the capital stock of said Northern Pacific Railway Company. That said Northern Securities Company was formed by George F. Baker, Jr., and Richard Trimble, of the city of New York and State of New York, and Abram Hyatt, of Allenhurst, in the State of New Jersey, who adopted the said articles of incorporation. That said three last named parties had no interest in said corporation other than the formation of the same for and at the request of said James J. Hill, William P. Clough, J. Pierpont Morgan, and their several associate stockholders of said Great Northern Railway Company and said Northern Pacific Railway Company, as above alleged, acting in concert with said parties.

That said James J. Hill, William P. Clough and J. Pierpont Morgan, who, with their associates, did on said 13th day of November, 1901, and prior thereto, own and control a large majority of the capital stock of both said Great Northern Railway Company and said Northern Pacific Railway Company, were prior to, and at the time of, the organization of said Northern Securities Company, almost continually in conference with each other and with a large number of other stockholders of said Great Northern Railway Company and said Northern Pacific Railway Company, but whose names are to your oratrix unknown, considering such organization and the scheme and agreement herein referred to, and the means and manner by which the laws of Minnesota, hereinafter referred to, could be most successfully evaded or avoided, all of which facts were well known to the organizers of said Northern Securities Company, including the parties executing the said articles of incorporation. That said Northern Securities Company was organized solely for the purpose of carrying out and accomplishing the designs, agreement and plans of said James J. Hill and J. Pierpont Morgan and their said associate stockholders, as herein set forth, and to effect a consolidation of the property, railway lines, corporate powers and franchises of said Great Northern and Northern Pacific Railway Companies, respectively, through said defendant the Northern Securities Company.

That prior to the organization of said Northern Securities Company the said owners and holders of a large majority of the capital stock of said Great Northern Railway Company, as well as the owners and holders of a large majority of the capital stock of said Northern Pacific Railway Company, as a part of the scheme or plan herein alleged, as well as a part of the plan and purpose of the organization of said Northern Securities Company, entered into a mutual agreement or arrangement, the exact terms of which are unknown to your oratrix, but which is in substance as follows:

The said owners of a large majority of the capital stock of said Great Northern Railway Company and said Northern Pacific Railway Company mutually agreed with each other and certain persons who thereafter became the officers and directors of said Northern Securities Company, to transfer or cause to be transferred to said Northern Securities Company in exchange for the capital stock of said last named company substantially all of the capital stock of said Great Northern Railway Company and said Northern Pacific Railway Company, respectively; the said capital stock of the Great Northern Railway Company to be transferred to and exchanged for the capital stock of the said Northern Securities Company on the basis of one share of the capital stock of the Great Northern Railway Company for one and 80–100 shares of the capital stock of said Northern Securities Company, and one share of the common stock of said Northern Pacific Railway Company for one and 15–100 shares of the capital stock of said Northern Securities Company. The $75,000,000 of the preferred stock of said Northern Pacific Railway Company to be retired in accordance with the provisions of the articles of incorporation of said Northern Pacific Railway Company, and the conditions and agreements under which the same was issued; said retirement to take place on the 1st day of January, 1902. The funds for retiring said preferred stock to be raised by the issuance by said Northern Pacific Railway Company of its negotiable bonds, bearing date November 15, 1901, of the aggregate amount of seventy-five million dollars, payable January 1, 1907, in gold coin of the United States, with interest thereon at the rate of

four per cent per annum, payable semi-annually in like gold coin, from and after January 1, 1902. The said bonds, however, to be convertible at the option of either the holders thereof, or said railway company, into shares of the common stock of said Northern Pacific Railway Company at the rate of one share of stock for each one hundred dollars of the principal sum of such bonds, and the said common stock, when so taken in exchange for such bonds, to be converted into stock of said Northern Securities Company upon the basis of one share for each one and 15–100 shares of stock of said Northern Securities Company.

That said preferred stock could only be retired by resolution of the board of directors of said Northern Pacific Railway Company; that a very large majority of said preferred stock was owned by certain individuals who were opposed to the agreement and plan herein referred to relative to turning over the management and control of said Northern Pacific Railway Company to said Northern Securities Company, and the holding of its stock by said Northern Securities Company; that the owners of said preferred stock so opposed to said agreement and plan were also owners of sufficient of the common stock of said Northern Pacific Railway Company to give them a small majority of the total capital stock of said Northern Pacific Railway Company; thus making it necessary, in order to carry out the plan and agreement herein set forth and to vest the management and control of said Northern Pacific Railway Company in said Northern Securities Company in the manner and for the purposes herein alleged, to retire said preferred stock; all of which was well known to the board of directors of said Northern Pacific Railway Company and to said J. Pierpont Morgan and his associate stockholders of said Northern Pacific Railway Company, as well as said Northern Securities Company.

That on or about the 13th day of November, 1901, the board of directors of said Northern Pacific Railway Company took such official action as was necessary to retire said preferred stock upon the basis and in accordance with the plan and agreement herein set forth; and thereafter said preferred stock was retired by the issuance of convertible bonds to the amount and

in the manner herein alleged. That immediately after the retirement of said preferred stock, said Northern Pacific Railway Company, acting through its board of directors and executive officers, exercised its right and option of declaring said bonds to be convertible into the shares of the common stock of said Northern Pacific Railway Company, and thereupon the same were so converted and the common stock of said Northern Pacific Railway Company issued in exchange therefor, upon the basis and for the purposes herein alleged. That in order to prevent the persons who owned said preferred stock, and who were opposed to the carrying out of the plan and agreement herein referred to, from acquiring a like control of the common stock, it was provided that the $75,000,000 of common stock into which the said bonds were convertible could only be subscribed for and taken by holders of the then outstanding $80,000,000 of the common capital stock of said Northern Pacific Railway Company ; each share of said common stock then outstanding entitling the owner and holder thereof to take an additional seventy-five eightieths of a share of said $75,000,000 additional common stock. That the retirement of said preferred stock and the conversion of the said bonds into common stock of said Northern Pacific Railway Company, and the exchange of said common stock for stock of said Northern Securities Company, as herein alleged, were each and all a part of the agreement, plan and scheme of said J. Pierpont Morgan and his said associate stockholders of said Northern Pacific Railway Company who then and there owned and controlled a large majority of the then outstanding common stock of said Northern Pacific Railway Company, under and by which the complete management and control of said Northern Pacific Railway Company was to be, and was thereafter, turned over to and vested in said Northern Securities Company in order that said Northern Pacific Railway Company, its property and franchises, might be in effect consolidated with the property and franchises of said Great Northern Railway Company, as herein alleged. That said James J. Hill and his associate stockholders of said Great Northern Railway Company had full knowledge of and assisted in retiring said preferred stock for the purposes and

objects herein alleged.    That as a part of said agreement and plan entered into between said James J. Hill and his associate stockholders and said J. Pierpont Morgan and his associate stockholders, each and all of whom were then, and are now, acting in concert for the purpose of evading and violating the laws of the State of Minnesota, in the manner, for the purposes, and with the object and design herein set forth, and in further-ance of said purposes and design, and to avoid the effect of any litigation which might be instituted to defeat the consummation of the agreement, plan and scheme herein referred to of vesting the complete management and control of the railway lines, properties and franchises of said Great Northern and Northern Pacific Railway Companies in said defendant Northern Securi-ties Company, said parties further undertook and agreed with each other and the persons who thereafter became the officers and directors of the defendant Northern Securities Company that pending the delivery and transfer of a majority of the cap-ital stock of said Great Northern Railway Company to said Northern Securities Company, the same should be held by or under the control of some person or corporation to your oratrix unknown; and that pending such delivery it was mutually agreed between said Hill and his associate stockholders and said Morgan and his associate stockholders and the persons who thereafter became the directors and officers of the defendant, as well as the person or corporation so temporarily holding said stock that the same should be held during said period for the purposes above set forth in trust for the use and benefit of the defendant, the Northern Securities Company; and that during such time the parties holding said stock should attend and vote the same at all meetings of the stockholders of said Great North-ern Railway Company, in the interests of the defendant, and as directed by the board of directors of said Northern Securities Company or the executive committee thereof, or in unison with the stock of said railway companies, actually assigned to and held by the defendant.    That said Northern Securities Company has not purchased and does not intend to purchase the stock of either of said railway companies, except by issuing its stock in exanange for and in lieu of the stock of said railway companies

on the basis and in the manner and for the purposes herein alleged.

That for the unlawful purposes aforesaid the said Northern Securities Company, by circular letter heretofore issued to the public, has offered and is still offering to issue and exchange for the capital stock of the said Great Northern and Northern Pacific Railway Companies, capital stock of said Northern Securities Company to the amount of one hundred and eighty dollars par value thereof for each share of capital stock of said Great Northern Railway Company, and to the amount of one hundred and fifteen dollars par value thereof for each share of stock of said Northern Pacific Railway Company. And that the said Northern Securities Company is about to receive, on the basis aforesaid, and will, unless enjoined therefrom, receive, hold and hereafter control all the capital stock of said Great Northern and Northern Pacific Railway Companies.

## X.

That the organization of said Northern Securities Company in the manner hereinbefore alleged, and the making of said agreement or arrangement hereinbefore referred to, are each and all a part of a scheme or plan on the part of said James J. Hill and his said associate stockholders of the Great Northern Railway Company, and J. Pierpont Morgan and his said associate holders of the stock of said Northern Pacific Railway Company, under and by which the said two last named railway companies are to be in effect consolidated, and the complete management and control of the business affairs of said corporations respectively placed in one body and under the direction and control of one man or one board of directors, through and by means of said defendant. That pursuant to said plan, agreement and arrangement, and in consummation thereof, and for the purpose of placing the complete management and control of said Great Northern Railway Company and said Northern Pacific Railway Company under one management, and for the purpose of establishing, in effect, a consolidation of said railway companies, together with said railway lines and properties, in and through said defendant, the said J. Pierpont Morgan

and his associate stockholders have actually assigned and delivered to said Northern Securities Company upwards of eighty-five per cent of the total capital stock of said Northern Pacific Railway Company; and your oratrix alleges, on information and belief, that said James J. Hill, and his associate stockholders of said Great Northern Railway Company have also actually assigned and delivered to said Northern Securities Company upwards of eighty-five per cent of the said capital stock of said Great Northern Railway Company. That the sole purpose, object and effect of the transfer of said stock by said James J. Hill and his said associates and the said J. Pierpont Morgan and his said associates to said Northern Securities Company was and is to transfer to and vest in said defendant Northern Securities Company the complete management and control of the respective lines of railway and railway properties of each of said railway companies within and without the State of Minnesota, and to place the complete management and control of the same, and the power to dictate the policy of each of said corporations, as well as the power and authority to fix rates and charges for the transportation of both freight and passengers within the State of Minnesota, as well as without said State, in the hands of and under the control of one party or board of directors, and thereby create, foster and perpetuate a monopoly in railway traffic in the State of Minnesota.

That the purpose, object and effect of the incorporation of the defendant and the receipt by it of a controlling amount of the capital stock of the said Northern Pacific and Great Northern Railway Companies, as well as each act of the officers and board of directors thereof, in entering into, adopting or executing the agreement or plan herein set forth, including the issuance and exchange of the capital stock of the Northern Securities Company for the stock of the said Northern Pacific and Great Northern Railway Companies on the basis hereinbefore set forth, was and is to place the said railway companies and the property and franchises thereof under a single management, and enable a single party or body of men acting as the board of directors of the said Northern Securities Company, or such executive committee as they may designate, to fix all rates and

charges for the transportation of passengers and freight over
any and all the lines of railway of each of said companies
within the State of Minnesota; to determine what trains shall
be operated over each or any of the lines of railway of each
of said railway companies, and to remove all competition in
freight or passenger traffic over said parallel and competing
lines, and prevent the building of lines into new territory as
well as into the territory now reached by only one of said
lines of railway; that the purpose of said agreement and of
the parties thereto was the creation of a trust or the formation
of a combination by which a monopoly of railway traffic in
northern Minnesota and elsewhere will be perfected; that the
defendant company was organized for, and is to be used as a
medium through and by which this unlawful agreement, pur-
pose and object can, and, if not enjoined, will be accomplished;
that this agreement and the consummation thereof is in restraint
of trade, tends to create a monopoly in railway traffic and is
against public policy, and void.

That holders of a large majority of the capital stock of both
said Great Northern and Northern Pacific Railway Companies
had knowledge of, consented to, and assisted in carrying out the
agreement, arrangement and scheme herein set forth by which
a large majority of the capital stock of each of said railway
companies was to be exchanged for the capital stock of said
Northern Securities Company upon the basis and for the pur-
poses herein set forth; and the said stockholders of said Great
Northern and Northern Pacific Railway Companies so consent-
ing to, taking part and assisting in the formation of said North-
ern Securities Company, and the perfecting of the agreement
and scheme herein set forth, constitute all of the stockholders
of said Northern Securities Company; and the board of di-
rectors and executive officers of said Northern Securities Com-
pany hereinafter named have been selected from and elected by
such stockholders of said Great Northern and Northern Pacific
Railway Companies.

That under the articles of association of said Northern Se-
curities Company, its corporate powers and entire business
management is vested in a board of directors consisting of

such number as shall be fixed from time to time, by the by-laws of said corporation, and the board of directors itself is authorized to make such by-laws as it deems best, and from time to time to alter, amend or repeal any by-laws. That the board of directors of said company thereby has power to determine its own number, and to adopt rules and regulations for its own conduct and the conduct of the affairs of said corporation. The articles of association further provide that said board of directors may appoint an executive committee in the manner provided by the by-laws of the company, which committee shall exercise all the powers and duties of said board of directors.

That on or about the 14th day of November, A. D. 1901, the following named persons were elected as and now constitute the board of directors of said Northern Securities Company, to wit: For the term of one year, James J. Hill, George F. Baker, Daniel S. Lamont, James Stillman and N. Terhune; for the term of two years, Samuel Thorne, Charles E. Perkins, Jacob H. Schiff and William P. Clough; for the term of three years, John S. Kennedy, D. Willis James, E. T. Nichols, Robert Bacon and E. H. Harriman. That on the 15th day of November, A. D. 1901, said board of directors met and elected the following executive officers of said company, to wit: President, James J. Hill; First Vice President, John S. Kennedy; Second Vice President, George F. Baker; Third Vice President, D. Willis James; Fourth Vice President, William P. Clough; Secretary and Treasurer, E. T. Nichols.

Complainant further alleges that said James J. Hill and said William P. Clough were, on said last named date, the President and Vice President respectively of said Great Northern Railway Company; and both were members of the board of directors of said last named company. That said E. T. Nichols was, on said date and now is, the Secretary and Assistant Treasurer of said Great Northern Railway Company. That said James J. Hill and his associates either own or have in their possession or under their control, a large majority of the capital stock of said Great Northern Railway Company. That said James J. Hill, Robert Bacon, George F. Baker, E. H. Harriman, D. Willis James, John S. Kennedy, D. S. Lamont and James Stillman were, on

said 14th day of November, 1901, and now are members of the board of directors of said Northern Pacific Railway Company, and constitute a majority of the board of directors of said named company.

That said James J. Hill and his associate directors and officers of said Northern Securities Company own and control a majority of the capital stock of said last named company; that during the month of December, 1901, said Northern Securities Company, through its directors and executive officers, began dictating the policy and management of said Northern Pacific as well as said Great Northern Railway Company, and ever since has been and now is directing and managing the business and property of both said Great Northern and Northern Pacific Railway Companies, and determining and enforcing freight and passenger rates on many of the lines of railway of said companies in the State of Minnesota, together with the manner and means of handling the freight and passenger business of said companies on such lines of railway, and will continue so to do unless enjoined as herein prayed.

That said Northern Securities Company has no authorized agent or representative within the State of Minnesota on whom a summons or other process in any legal proceeding may be served.

That the massing and concentration of said railway properties and the control and management thereof in the defendant company in the manner hereinbefore outlined, tends to and does create a monopoly in railway traffic in the State of Minnesota, and tends to and does deprive the State of Minnesota and the citizens thereof of the privilege of competition in fixing charges and rates of transportation for a large amount of freight transported annually over the lines of railway of each of said railway companies, between stations upon the lines of railway of both said companies within the State of Minnesota.

That it has ever been a part of the settled and public policy of the State of Minnesota to prohibit therein, in any way, the consolidation in any manner of competing and parallel lines of railway; and to this end the legislature of the State of Minnesota did, in the year 1874, pass the following enactment, which

ever since has remained and now is a part of the statute law of the State of Minnesota, known as chapter 29 of the General Laws of 1874, to wit:

" Sec. 1. No railroad corporation, or the lessees, purchaser or managers of any railroad corporation, shall consolidate the stock, property or franchise of such corporation with, or lease or purchase the works or franchise of, or in any way control any other railroad corporation owning or having under its control a parallel or competing line ; nor shall any officer of such railroad corporation act as an officer of any other railroad corporation owning or having the control of a parallel or competing line, and the question whether railroads are parallel or competing lines shall, when demanded by the party complainant, be decided by a jury as in other civil issues.

" Sec. 2. This act shall take effect and be in force from and after its passage.    Approved March 9, 1874."

That in the year 1881 the legislature of the State of Minnesota passed the following enactment, which ever since has remained and now is a part of the statute law of the said State and known as chapter 94 of the General Laws of 1881, to wit:

" Sec. 3. No railroad corporation shall consolidate with, lease or purchase, or in any way become the owner of or control any other railroad corporation or stock, franchises, rights or property thereof, which owns or controls a parallel or competing line.

" Sec. 4. This act shall take effect and be in force from and after its passage.    Approved March 3, 1881."

That said Northern Securities Company is a railroad corporation within the meaning of the laws of the State of Minnesota; and the purpose, object and design of the said organizers and promoters of said Northern Securities Company, both in the organization thereof and in the making and carrying out of the said plans, agreement and designs hereinbefore referred to, was and is to violate the said legislative enactments of the State of Minnesota, and to evade and escape the provisions thereof ; and it is the purpose, intent and design of said corporation, its stockholders, directors, executive committee, officers, agents and representatives, to violate the said legislative enactments,

and to evade and escape the terms and provisions thereof, and to effect a consolidation of said railway corporations and properties as herein alleged. That each and all the said acts are violations and evasions of the said laws and the settled public policy of the State of Minnesota, and unless said parties are enjoined will cause the State of Minnesota irreparable injury.

That for many years last past it has been a part of the settled policy of the State of New Jersey to permit the consolidation of only such lines of railroad as are or can be connected so as to form continuous lines of railroad, and not to permit the consolidation of parallel or competing lines; and to that end, in the year 1885, the legislature of the State of New Jersey enacted a law which permits the consolidation of such lines as shall or may form connecting or continuous lines of railroads.

Your oratrix is informed and believes, and upon information and belief alleges, that defendant is not the owner of any property or stock or securities of any corporation, except as above set forth, and is not engaged in any business whatever except such as is incidental to the ownership of such stock and the general management and control of said Great Northern and Northern Pacific Railway Companies and the railway lines and properties thereof.

Your oratrix further alleges that if the defendant is permitted to control and manage the affairs of said Great Northern and Northern Pacific Railway Companies, in a manner hereinbefore alleged or otherwise, all competition between them will forever cease, and a monopoly in railway traffic in Minnesota be created, to the great and permanent and irreparable damage and injury to the State of Minnesota and to the people thereof, and in violation of its laws.

That your oratrix has and can have no other adequate remedy or relief by action at law except as herein prayed for in equity.

To the end, therefore, that the defendant, the Northern Securities Company may, if it can, show cause why your oratrix should not have the relief herein prayed for, and that it may be compelled to answer all and singular the premises, and all matters and things herein stated, as fully and particularly as if they were here again repeated, and said company thereunto in-

terrogated, and that the defendant may be required to answer without oath, its answer under oath being hereby expressly waived; and that the defendants may, by the decree of this court, be perpetually enjoined and restrained:

First. From voting at any meeting of the stockholders of either said Great Northern or Northern Pacific Railway Company any of the capital stock of either of said companies by any means or in any manner whatsoever, and from attending, by reason of such ownership, possession or control of stock, either through its officers or by proxy, or in any other manner, any meeting of the stockholders of either of said companies.

Second. That the defendant, its stockholders, officers, directors, or the executive committee thereof, its attorneys, representatives, agents or servants, and each of them, be enjoined and restrained from, in any way, aiding, advising, directing, interfering with or in any way taking part, directly or indirectly, in any manner whatsoever, in the management, control or operation of any of the lines of railway of either of said companies, or in the management or control of the affairs of either of said companies.

Third. That the said defendant, its officers, attorneys, representatives, agents or servants, including its board of directors, or any of its members as such, be enjoined and restrained from exercising any of the powers or performing any of the duties, or in any manner acting as a representative, officer, member of the board of directors or employé, of either said Great Northern or Northern Pacific Railway Company, or in any way exercising any management, direction or control over the same.

Fourth. That said defendant, its stockholders, directors and other officers, representatives and agents, be enjoined and restrained from doing any and all acts and making any arrangements or combinations by contract or otherwise having for their object, effect or result the consolidation or establishment of a joint management or control in any manner whatsoever of the said Great Northern and Northern Pacific Railway Companies, their lines of railway or properties.

Fifth. That the said defendant be enjoined from either directly or indirectly holding, owning or controlling any of the stock of

˂˟˟˟˟˟ ˟˟ said companies at one and the same time for any of the purposes or objects alleged in said bill, or otherwise.

Sixth. That in case it shall appear upon the hearing that the defendant owns or controls, or is acting in concert with the owners of, a majority of the capital stock of either of said railway companies, and owns or controls a minority of the stock of the other of said companies, then that the defendant, its officers, directors, agents, or representatives, be enjoined and restrained from receiving, acquiring or controlling any additional capital stock of such other railway company.

Seventh. And your oratrix further prays the leave of this court to amend this, its bill of complaint, if amendment thereto shall become necessary, including the right to bring in other parties defendant for the purpose of giving force and effect to any decree that may be made by the court herein.

And that complainant be granted such other and further or different relief as the nature of this case may require, and as shall be agreeable to equity and good conscience.

*Mr. W. B. Douglas* and *Mr. M. D. Munn* for complainant. *Mr. George P. Wilson* was on their brief.

*Mr. William D. Guthrie* and *Mr. John W. Griggs* for defendant. *Mr. John G. Johnson* was on their brief.

MR. JUSTICE SHIRAS, after making the above statement, delivered the opinion of the court.

Whether a bill in equity filed in this court, in the name of a State, which seeks to prevent by injunction a corporation organized under the laws of another State, with power to acquire and hold shares of the capital stock of any other corporation, from obtaining and exercising ownership and control of two or more competing railroad companies of the complainant State, so as to evade and defeat its laws and policy forbidding the consolidation of such railroads when parallel and competing, presents the case of a controversy of a civil nature whereof this court has jurisdiction under the Constitution and laws of the

United States, and whether the bill in the present case is of that description, or whether it is the case of a suit brought by a State to enforce its penal statutes, and hence within the principle of the decision in *Wisconsin* v. *Pelican Insurance Co.*, 127 U. S. 265, are questions which have been ably discussed by counsel.

·But it is not necessary for us to consider and answer those questions, for, in view of the nature of the facts presented and the remedies prayed for in the bill proposed to be filed, we think that the suit is defective for want of essential parties whose rights would be vitally affected by the relief sought therein.

The general rule in equity is that all persons materially interested, either legally or beneficially, in the subject-matter of a suit, are to be made parties to it, so that there may be a complete decree, which shall bind them all. · By this means the court is enabled to make a complete decree between the parties, to prevent future litigation, by taking away the necessity of a multiplicity of suits, and to make it perfectly certain that no injustice is done, either to the parties before it, or to others who are interested in the subject-matter, by a decree which might otherwise be granted upon a partial view only of the real merits. When all the parties are before the court, the whole case may be seen; but it may not, where all the conflicting interests are not brought out upon the pleadings by the original parties thereto. Story's Eq. Plds. sec. 72.

The established practice of courts of equity to dismiss the plaintiff's bill if it appears that to grant the relief prayed for would injuriously affect persons materially interested in the subject-matter who are not made parties to the suit, is founded upon clear reasons, and may be enforced by the court, *sua sponte*, though not raised by the pleadings or suggested by the counsel. *Shields* v. *Barrow*, 17 How. 130; *Hipp* v. *Babin*, 19 How. 271, 278; *Parker* v. *Winnipiseogee Lake Cotton and Woolen Co.*, 2 Black, 545.

In the case of *Shields* v. *Barrow*, 17 How. 130, the question was fully discussed, and it was shown, upon a review of the previous cases, that there are three classes of parties to a bill in equity.

They are: 1. Formal parties. 2. Persons having an interest in the controversy, and who ought to be made parties, in order that the court may act on that rule which requires it to decide on, and finally determine the entire controversy, and do complete justice, by adjusting all the rights involved in it. These persons are commonly termed necessary parties; but if their interests are separable from those of the parties before the court, so that the court can proceed to a decree, and do complete and final justice, without affecting other persons not before the court, the latter are not indispensable parties. 3. Persons who not only have an interest in the controversy, but an interest of such a nature that a final decree cannot be made without either affecting that interest, or leaving the controversy in such a condition that its final determination may be wholly inconsistent with equity and good conscience. The court in respect to the act of Congress of February 28, 1839, 5 Stat. 321, and to the forty-seventh rule in equity practice, said (p. 140):

"The first section of that statute enacts : That when in any suit, at law or in equity, commenced in any court of the United States, there shall be several defendants, any one or more of whom shall not be inhabitants of or found within, the district where the suit is brought, or shall not voluntarily appear thereto, it shall be lawful for the court to entertain jurisdiction, and proceed to the trial and adjudication of such suit between the parties who may be properly before it; but the judgment or decree rendered therein shall not conclude or prejudice other parties not regularly served with process, or not voluntarily appearing to answer; and the non-joinder of parties, who are not so inhabitants, or found within the district, shall constitute no matter of abatement or other objection to said suit.

"This act relates solely to the non-joinder of persons who are not within the reach of the process of the court. It does not affect any case where persons, having an interest, are not joined because their citizenship is such that their joinder would defeat the jurisdiction; and, so far as it reaches suits in equity, we understand it to be no more than a legislative affirmance of the rule previously established by the cases of *Cameron* v. *McRoberts*, 3 Wheat. 591; *Osborn* v. *The Bank of the United States*,

9 Wheat. 738, and *Harding* v. *Handy*, 11 Wheat. 132.   For this court had already there decided that the non-joinder of a party who could not be served with process would not defeat the jurisdiction.   The act says it shall be lawful for the court to entertain jurisdiction; but as is observed by this court, in *Mallow* v. *Hinde*, 12 Wheat. 193, 198, when speaking of a case where an indepensable party was not before the court, ' we do not put this case upon the ground of jurisdiction, but upon a much broader ground, which must equally apply to all courts of equity, whatever may be their structure as to jurisdiction; we put it on the ground that no court can adjudicate directly upon a person's right, without the party being either actually or constructively before the court.'   So that, while this act removed any difficulty as to jurisdiction, between competent parties, regularly served with process, it does not attempt to displace that principle of jurisprudence on which the court rested the case last mentioned. And the forty-seventh rule is only a declaration, for the government of practitioners and courts, of the effect of this act of Congress, and of the previous decisions of this court, on the subject of that rule.   *Hogan* v. *Walker*, 14 How. 36.

" It remains true, notwithstanding the act of Congress and the forty-seventh rule, that a Circuit Court can make no decree affecting the rights of an absent person, and can make no decree between the parties before it, which so far involves or depends upon the rights of an absent person, that complete and final justice cannot be done between the parties to the suit without affecting those rights."

*California* v. *Southern Pacific Co.*, 157 U. S. 229, was a case in several particulars like the present one.   There a bill was filed in this court by the State of California against the Southern Pacific Company, a corporation of the State of Kentucky, claiming title and jurisdiction by the State over certain large tracts of land lying upon the shores of the bay of San Francisco and over the harbor waters of said bay, including San Antonio Creek, and averring that the Southern Pacific Company claimed adversely to the State, and was engaged in placing structures in and upon said tracts of land, thereby obstructing navigation in the bay and adjoining waters.   The bill prayed

for a decree quieting the title of the State and enjoining the defendant company from maintaining the structures that it had placed upon said tracts and the adjacent waters. The defendant company answered the bill, denying the ownership of the complainant in the premises in dispute, and setting forth its own title derived from the town of Oakland, as to the whole of the water front of that town, through one Carpentier, as grantee of said town by ordinance and deed of conveyance, and claiming that by subsequent mesne conveyances the said title and property had become vested, as to a part thereof, in the Central Pacific Railroad Company, and, as to another part, in the South Pacific Coast Railway Company, and in the defendant company as lessee. It further was claimed that certain ordinances and deeds of the town of Oakland operated as a grant by the city of Oakland and the State of California of the land to the Oakland Water Front Company, as grantee or alienee of Carpentier. The case was duly put at issue, and a commissioner was appointed to take testimony therein and to return the same to the court.

When the case came on for hearing it was held by this court that the city of Oakland and the Oakland Water Front Company were so situated in respect to the litigation that the court ought not to proceed in their absence. In reaching this conclusion the court reviewed the cases, including the cases above cited and others.

Upon the contention that the city of Oakland and the Oakland Water Front Company might be made parties defendant, and the court thus enabled to proceed with the case, the. court held that this could not be done, because this court could not exercise original jurisdiction in a suit between a State on the one hand and a citizen of another State and citizens of the complainant State on the other. Accordingly, the bill was dismissed for want of parties who should be joined, but could not be without ousting our jurisdiction.

We shall, therefore, proceed to examine the substance of the bill proposed to be filed, in order to see whether it discloses a case in which a decree could be granted which would do final and complete justice between the nominal parties without

vitally affecting other persons not before the court.    As already stated, a conclusion reached that the suit cannot be entertained for want of necessary and essential parties, will not imply any expression of opinion beyond that question.

As the bill is set forth in full in the preceding statement, it will not be necessary to here repeat its allegations.  They may be summarized as follows:

The complainant is the State of Minnesota; the defendant is the Northern Securities Company, a corporation of the State of New Jersey.

It is part of the policy of the State of Minnesota, as declared in its public statutes, to prohibit therein the consolidation in any manner of competing and parallel lines of railway.    The statutes specially recited in the bill are the act of March 9, 1874, the first section whereof is in the following terms: "No railroad corporation, or the lessees, purchaser or managers of any railroad company, shall consolidate the stock, property or franchise of such corporation with, or lease or purchase the works or franchise of, or in any way control any other railroad corporation owning or having under its control a parallel or competing line; nor shall any officer of such railroad corporation act as an officer of any other railroad corporation owning or having the control of a parallel or competing line, and the question whether railroads are parallel or competing lines shall, when demanded by the party complainant, be decided by a jury as in other civil issues;" and the act of March 3, 1881, of which the third section is as follows: "No railroad company shall consolidate with, lease, or purchase, or in any way become the owner of or control any other railroad corporation or stock, franchises, rights or property thereof, which owns or controls a parallel or competing line."

The Great Northern Railway Company is a corporation organized and existing under an act duly passed by the Territory of Minnesota and under various subsequent acts of the State of Minnesota, and owns and controls, as lessee, several important lines of railroad, some only within and others extending beyond the State of Minnesota, and which are maintained by the Great Northern Railway Company as one complete system.    The

board of directors of the Great Northern Railway Company, at the time of the organization of the Northern Securities Company, to wit, on or about November 13, 1901, was and now is composed of the following-named persons, to wit: James J. Hill, James N. Hill, Samuel Hill, William P. Clough, Edward Sawyer, Jacob H. Schiff and Henry W. Cannon. That on said last mentioned date the Great Northern Railway Company had issued and there was then outstanding a total of one hundred and twenty-five million dollars, par value, of the capital stock of said corporation, of which, it is alleged, that said James J. Hill was on said last mentioned date the owner of or had subject to his direction and disposition, more than a majority of said capital stock so outstanding.

The Northern Pacific Railway Company was organized under the laws of the State of Wisconsin of the year 1895, and afterwards, by filing a certified copy of its articles of incorporation, became a corporation of the State of Minnesota and subject to the laws of that State relating to railroad corporations. In the year 1896 the Northern Pacific Railway Company duly purchased and became the owner of the entire railroad properties and lines formerly owned by the Northern Pacific Railroad Company, and at all times since has continuously owned and operated each and all of said lines of railway situated within the State of Minnesota, and which connect the cities of St. Paul and Minneapolis and Duluth, and connect with the lines of railways outside the State of Minnesota. During the year 1899 the said Northern Pacific Railway Company purchased, and ever since has owned and operated a line of railway extending from the cities of St. Paul and Minneapolis to Duluth, Minnesota. Said last mentioned line parallels and is a competing line of railway for both freight and passenger traffic with the line of railway between said Minneapolis and St. Paul and Duluth, owned by the Eastern Railway Company of Minnesota, but which is operated, controlled and managed by said Great Northern Railway Company, as a part of the system of that company. The lines of railway now owned and operated by said Great Northern Railway Company within the State of Minnesota are parallel and competing lines for freight and passenger traffic

with the lines of railway now owned, operated and controlled by said Northern Pacific Railway Company within the State of Minnesota; and also said lines of railway owned, operated and controlled by said Great Northern Railway Company, and also the lines of railway owned, operated and controlled by said Northern Pacific Railway Company, which connect with the lines of railway owned, operated and controlled by each of said companies respectively within the State of Minnesota, are parallel and competing lines through the States of North Dakota, Montana, Idaho and Washington to Puget Sound on the Pacific Coast, for passenger and freight traffic. That said companies are the only railway companies owning or operating lines of railway crossing the State of Minnesota and connecting the Pacific Ocean by rail with points in Minnesota.

That the Chicago, Burlington and Quincy Railway Company, a corporation of the State of Illinois, has, for many years last past, owned, operated and controlled an extensive system of railway lines, connecting the city of Chicago with the city of Denver, in the State of Colorado, and with the city of Billings, in the State of Montana, which last named point is a junction and competitive point for freight and passenger traffic with said Northern Pacific Railway Company, etc. That during the year 1901 the said Great Northern Railway Company and said Northern Pacific Railway Company jointly purchased ninety-eight per cent of the total capital stock of said Chicago, Burlington and Quincy Railway Company, aggregating approximately one hundred and seven million of dollars, par value, and now own the same, and issued in payment therefor the joint bonds of said Great Northern and Northern Pacific Railway Companies, payable in twenty years from the date thereof, and bearing interest at the rate of four per cent per annum, payable semi-annually. That the said Great Northern and Northern Pacific Railway Companies issued and delivered in exchange for each one hundred dollars in amount of said Chicago, Burlington and Quincy Railway Company stock two hundred dollars in amount of the said bonds; and that under and by virtue of the purchase of the said stock the joint ownership and control of the said Chicago, Burlington and Quincy Railway Company are vested in,

and ever since have been exercised by, the said Great Northern and Northern Pacific Railway Companies. During April, 1901, and ever since, the following named persons constituted and now are the members of the board of directors of the Northern Pacific Railway Company : James J. Hill, Robert Bacon, George F. Baker, E. H. Harriman, H. McK. Twombly, Brayton Ives, D. Willis James, John S. Kennedy, Daniel S. Lamont, Charles S. Mellen, Samuel Rea, William Rockefeller, Charles Steele, James Stillman and Eben B. Thomas. On November 13, 1901, J. Pierpont Morgan, with certain other unknown persons, but who were acting with said Morgan, owned and had in their possession, or held and had subject to their control and disposition, upwards of eighty-five per cent of the total capital stock of said Northern Pacific Railway Company. The Northern Securities Company was organized on November 13, 1901, with its principal office at Hoboken, in the State of New Jersey, and the objects for which the corporation was formed, as stated in the articles of incorporation, are to acquire and hold, as investments, the bonds, securities and capital stock of any other corporation or corporations of the State of New Jersey, or of any other State, Territory or country, and while owner of said stock to exercise all the rights, powers and privileges of ownership, including the right to vote thereon ; and it is declared that the corporation shall have power to conduct its business in other States and in foreign countries, to have one or more offices out of the State, and to purchase, hold and convey real and personal property out of the State.

It is alleged that the Northern Securities Company was incorporated at the instigation and request of James J. Hill, William P. Clough, and certain unknown stockholders of said Great Northern Railway Company, who, with said Hill and Clough, owned or controlled, or have the disposition and management of, a large majority of the capital stock of said Great Northern Railway Company, and with the coöperation of J. Pierpont Morgan and certain other unknown stockholders of said Northern Pacific Railway Company, who, with said Morgan, owned and controlled, or have the disposition and man-

agement, of, a large majority of the capital stock of said Northern Pacific Railway Company.

On November 14, 1901, James J. Hill, George F. Baker, Daniel S. Lamont, James Stillman, N. Terhune, Samuel Thorne, Charles L. Perkins, Jacob H. Schiff, William P. Clough, John S. Kennedy, Willis James, E. T. Nichols, Robert Bacon and E. H. Harriman were elected directors of the Northern Securities Company, and said directors on November 15, 1901, elected James J. Hill to be president, and John S. Kennedy, George F. Baker, Willis James and William P. Clough to be vice presidents, and E. T. Nichols, to be secretary and treasurer, of said company.   It is alleged that the holders of a large majority of the capital stock of both said Great Northern and Northern Pacific Railway Companies had knowledge of and assisted in the formation of the said Northern Securities Company, and that such stockholders, so consenting and assisting, constitute all of the stockholders of said Northern Securities Company.

The bill charges that the purpose of the formation of the Northern Securities Company was to place the management and control of the Great Northern Railway Company and of the Northern Pacific Railway Company under one management, and to thus, in effect, establish a consolidation of said railway companies, and defeat and evade the statutes and policy of the State of Minnesota forbidding consolidation of parallel and competing lines of railway.

The relief prayed by the bill is that the defendant company be perpetually enjoined and restrained from voting, at any meeting of either said Great Northern and Northern Pacific Railway Company, any of the capital stock of either of said companies by any means or in any manner whatsoever, and from attending, by reason of such ownership, possession or control of stock, either through its officers or by proxy, or in any other manner, any meeting of the stockholders of either of said companies, and from, in any way, aiding, advising, directing, interfering with or in any way taking part, directly or indirectly, in any manner whatsoever, in the management, control, or operation of any of the lines of railway of either of said companies; and that said defendant, its officers, attorneys, repre-

sentatives, agents, or servants, including its board of directors, or any of its members as such, be enjoined and restrained from exercising any of the powers or performing any of the duties, or in any manner acting as a representative, officer, member of the board of directors or employé, of either said Great Northern or Northern Pacific Railway Company, or in any way exercising any management, direction or control over the same; and that said defendant, its stockholders, directors and other officers, representatives and agents, be enjoined and restrained from doing any and all acts and making any arrangements or combinations, by contract or otherwise, having for their object, effect or result the consolidation or establishment of a joint management or control in any manner whatsoever of the said Great Northern and Northern Pacific Railway Companies, their lines of railway or properties; and that said defendant be enjoined from either directly or indirectly holding, owning or controlling any of the stock of either of said companies at one and the same time for any of the purposes or objects alleged in the bill, or otherwise, and that in case it shall appear upon the hearing that the defendant owns or controls, or is acting in concert with the owners of, a majority of the capital stock of either of said railway companies, and owns or controls a minority of the stock of the other of said companies, then that the defendant, its officers, directors, agents or representatives, be enjoined and restrained from receiving, acquiring or controlling any additional capital stock of such other railway company; and further for leave to amend the bill of complaint, if amendment thereto shall become necessary, including the right to bring in other parties defendant for the purpose of giving force and effect to any decree that may be made by the court herein.

More briefly stated, the case presented by the charges and prayers of the bill is that the State of Minnesota is apprehensive that a majority of the stockholders respectively of the Great Northern Railway Company and of the Northern Pacific Railway Company have combined and made an arrangement, through the organization of a corporation of the State of New Jersey, whereby such a consolidation, or what is alleged to amount to the same thing, a joint control and man-

agement of the Great Northern and Northern Pacific Railway Companies, shall be effected as will operate to defeat and overrule the policy of the State in prohibiting the consolidation of parallel and competing lines of railway, and therefore appeals to a court of equity to prevent by injunction the operation and effect of such a combination and arrangement.

But at once, as we have seen, the court is put upon inquiry whether the parties and persons to be affected by such an injunction are before it.

The narrative of the bill unquestionably discloses that the parties to be affected by a decision of the controversy are, directly, the State of Minnesota, the Great Northern Railway Company, the Northern Pacific Railway Company, corporations of that State, and the Northern Securities Company, a corporation of the State of New Jersey, and, indirectly, the stockholders and bondholders of those corporations, and of the numerous railway companies whose lines are alleged to be owned, managed or controlled by the Great Northern and Northern Pacific Railway Companies.

Can such a controversy be determined with due regard to the interests of all concerned, by a suit solely between the State of Minnesota and the Northern Securities Company? It is, indeed, alleged that all of the stockholders of the Northern Securities Company are stockholders in the two railroad companies, and, therefore, it may be said that the latter stockholders are sufficiently represented in the litigation by the Northern Securities Company; but it is not alleged that the stockholders of the Northern Securities Company constitute or are composed of all the stockholders of the two railroad companies, and, in fact, the contrary is conceded in the allegations of the bill that a majority only of the stock of one, or perhaps both, of the two railroad companies is owned, or at least controlled and managed, by the Northern Securities Company. It is obvious, therefore, that the rights of the minority stockholders of the two railroad companies are not represented by the Northern Securities Company. They have a right to be represented, in the controversy, by the companies whose stock they hold, and their rights ought not to be affected without a hearing, even if

it were conceded that a majority of the stock in such companies, held by a few persons, had assisted in forming some sort of an illegal arrangement. Moreover, it must not be overlooked that it is not the private interests of stockholders that are to be alone considered. The directors of the Great Northern and Northern Pacific Railway Companies are appointed to represent and protect not merely the private and pecuniary interests of the stockholders, but the rights of the public at large, which is deeply concerned in the proper and advantageous management of these public highways. It is not sufficient to say that the Attorney General, or the Governor, or even the Legislature of the State, can be conclusively deemed to represent the public interests in such a controversy as that presented by the bill. Even a State, when it voluntarily becomes a complainant in a court of equity, cannot claim to represent both sides of the controversy. Not only have the stockholders, be they few or many, a right to be heard, through the officers and directors whom they have legally selected to represent them, but the general interests of the public, which might be deeply affected by the decree of the court, are entitled to be heard; and that, when the State is the complainant, and in a case like the present, can only be effected by the presence of the railroad companies as parties defendant.

Upon investigation it might turn out that the allegations of the bill are well founded, and that the State is entitled to relief; or it might turn out that there is no intention or design on the part of the railroad companies to form any combination in disregard of the policy of the State, but that what is proposed is consistent with that policy and advantageous to the communities affected. But, in making such investigation, a court of equity must insist that both sides of the controversy shall be adequately represented and fully heard.

When it appears to a court of equity that a case, otherwise presenting ground for its action, cannot be dealt with because of the absence of essential parties, it is usual for the court, while sustaining the objection, to grant leave to the complainant to amend by bringing in such parties. But when it likewise appears that necessary and indispensable parties are be-

yond the reach of the jurisdiction of the court, or that, when made parties, the jurisdiction of the court will thereby be defeated, for the court to grant leave to amend would be useless. Sec. 2 of Article 3 of the Constitution of the United States.

As then, the Great Northern and the Northern Pacific Railway Companies are indispensable parties, without whose presence the court, acting as a court of equity, cannot proceed, and as our constitutional jurisdiction would not extend to the case if those companies were made parties defendant, the motion for leave to file the proposed bill must be and is

*Denied.*