**UNITED STATES v. BEIT BROS. et al.**

Criminal Action No. 6980.

District Court, D. Connecticut.

May 4, 1943.

Robert P. Butler, U. S. Dist. Atty., and Valentine J. Sacco, Asst. U. S. Dist. Atty., both of Hartford, Conn., for the Government.

Charles V. James and Brown & James, all of Norwich, Conn., for defendants.

SMITH, District Judge.

The information in this case charges a violation of Meat Restriction Order No. 1 by slaughtering above allotted quotas. The defendants' demurrer, attacking the information, is set forth in five paragraphs.

Of these, the fifth, attacking the information as charging an infamous crime, is conceded to be without merit, and is overruled.

The first paragraph of the demurrer rests on the ground that the section of the Emergency Price Control Act counted on does not authorize the establishment of slaughtering quotas. Amendment to the information has been permitted and the charge is now based on Title III of the Second War Powers Act of 1942. The demurrer will be treated as attacking the authority of the Administrator of the Office of Price Administration to establish slaughtering quotas under this Act.

The information is based on Meat Restriction Order No. 1, which in turn is based on the power given to the President by Title III, Section 2(a) (2), Act of March 27, 1942, Second War Powers Act of 1942, Title 50 U.S.C.A.Appendix, § 633, particularly the following provision: "Whenever the President is satisfied that the fulfillment of requirements for the defense of the United States will result in a shortage in the supply of any material or of any facilities for defense or for private account or for export, the President may allocate such material or facilities in such manner, upon such conditions and to such extent as he shall deem necessary or appropriate in the public interest and to promote the national defense."

Section 2(a) (8) of the same title provides that: "The President may exercise any power, authority, or discretion conferred on him by this subsection (a), through such department, agency, or officer of the Government as he may direct and in conformity with any rules or regulations which he may prescribe."

This power is delegated to the Chairman of the War Production Board, with a provision that the powers may be delegated by him to the Office of Price Administration or its Administrator. See Executive Order 9125, April 7, 1942, 7 Federal Register 2719, Sections 1, 3, 3(a), 3(b), and 3(d).

The delegation to the Administrator of the Office of Price Administration was accomplished by Directive #1, War Production Board, January 24, 1942, 7 Federal Register 562, and Supplementary Directive #1–M, War Production Board, September 12, 1942, 7 Federal Register 7234.

The order of the Administrator of the Office of Price Administration on which the information in this case is based is Meat Restriction Order No. 1, October 1, 1942, 7 Federal Register 7839, Section 1407.904. 7 Federal Register 7840.

This order is continued in full force and effect by Section 14 of Executive Order 9280, December 5, 1942, 7 Federal Register 10179, transferring certain powers over food to the Secretary of Agriculture.

The question raised in the first paragraph is whether the means used—slaughtering quotas—are adapted to the end desired and within the authorization of the Act—allocation of scarce material needed for defense.

■ That unlimited supplies of meat for consumption at will are not available is certainly not an unreasonable conclusion, nor that adequate supplies of meat for the armed forces are needed for the effective prosecution of the war. That restriction of the portion of the total supply to be consumed by the civilian population will tend to assure that supplies remain available for military use is incontestable. A quota system governing slaughter for delivery for civilian consumption is an apt means to the end of such restriction. That any particular alternative means be utilized is not required. Indeed, no practicable alternative readily suggests itself. The slaughtering quota provisions of Meat Restriction Order No. 1 are within the grant by the Congress in the Second War Powers Act of authority to allocate scarce materials for defense.

The second paragraph of the demurrer is based on the claim that Meat Restriction Order No. 1 does not, and does not purport to, regulate the slaughter and delivery of cattle or beeves in intrastate commerce.

The order by its terms makes no distinction between slaughter and delivery in intrastate commerce and slaughter and delivery in interstate commerce. It purports to cover any person engaged in the business of slaughtering regardless of the inter- or intrastate nature of the commerce in which he is engaged.

The short answer to this ground of demurrer is that the Act is based, not on the commerce power of the Congress, but on the war powers, and by its terms does regulate slaughter and delivery in intrastate as well as interstate commerce.

If the order and the Act on which it is based are valid under the war powers, the fourth ground of demurrer, that no allegation is made of interstate commerce, must therefore also fail.

The remaining and principal ground of demurrer is the claim that the Congress has no power under the Constitution over an intrastate slaughtering business on which a statute and order such as those counted on here can be based.

■ The Government's position is that such power does exist in the Congress, created by Article I, Section 8, of the Constitution of the United States. There can be no doubt that vast powers over the rights and liberties of the people are committed to the Congress in time of war by that section, in order that the Congress by effective prosecution of war may maintain the independence of this nation, and the future integrity of the guaranties to the individual members of our society of the peacetime rights established and maintained by and for our people through the Constitution.

"The war power is a broad and comprehensive grant. It is 'well-nigh limitless.'" Henderson v. Kimmel, D.C.Kan.1942, 47 F Supp. 635, 641.

"From its very nature the war power, when necessity calls for its exercise, tolerates no qualifications or limitations, unless found in the Constitution or in applicable principles of international law. In the words of John Quincy Adams, 'This power is tremendous; it is strictly constitutional; but it breaks down every barrier so anxiously erected for the protection of liberty, property and of life.' To the end that war may not result in defeat, freedom of speech may, by act of Congress be curtailed or denied so that the morale of the

people and the spirit of the army may not be broken by seditious utterances; freedom of the press curtailed to preserve our military plans and movements from the knowledge of the enemy; deserters and spies put to death without indictment or trial by jury; ships and supplies requisitioned; property of alien enemies, theretofore under the protection of the Constitution, seized without process and converted to the public use without compensation and without due process of law in the ordinary sense of that term; prices of food and other necessities of life fixed or regulated; railways taken over and operated by the government; and other drastic powers, wholly inadmissible in time of peace, exercised to meet the emergencies of war." United States v. Macintosh, 1931, 283 U.S. 605, 622, 51 S.Ct. 570, 574, 75 L.Ed. 1302.

Judge Nordbye in his opinion in a recent case has pointed out some instances of exercise of the war power of the Congress upheld by the courts in the past.

"Congress drafts soldiers to fight the Nation's battles, and it can also, with constitutional limitations, regulate and draft the resources of the Nation. The Supreme Court has already spoken on this question. In Northern Pacific Railroad Company v. North Dakota, 250 U.S. 135, 39 S.Ct. 502, 63 L.Ed. 897, it has upheld the power to take over and operate the railroads; in Dakota Central Telephone Company v. South Dakota, 250 U.S. 163, 39 S.Ct. 507, 63 L.Ed. 910, 4 A.L.R. 1623, to take over and operate telegraph and telephone systems; in Moore & Tierney, Inc., v. Roxford Knitting Company, 2 Cir., 265 F. 177, 11 A.L.R. 1415, certiorari denied 253 U.S. 498, 40 S.Ct. 588, 64 L.Ed. 1032, to place compulsory orders for materials required for national defense; in Selective Draft Law Cases (Arver v. United States), 245 U.S. 366, 38 S.Ct. 159, 62 L.Ed. 349, L.R.A.1918C, 361, Ann.Cas.1918B, 856, to draft manpower for service in the armed forces; in Jacob Ruppert, Inc., v. Caffey, 251 U.S. 264, 40 S.Ct. 141, 64 L.Ed. 260, to prohibit the manufacture or sale of alcoholic beverages; in Highland v. Russell Car & Snow Plow Co., 279 U.S. 253, 49 S.Ct. 314, 73 L.Ed. 688, to regulate the prices of certain commodities; in Block v. Hirsh, 256 U.S. 135, 41 S.Ct. 458, 65 L.Ed. 865, 16 A.L.R. 165, to control rents." Nordbye, J., in United States v. C. Thomas Stores, Inc., D.C.Minn., February 26, 1943, 49 F. Supp. 111, 113.

Additional instances of exercise of the war powers sustained by the courts include the present Emergency Price Control Act, 50 U.S.C.A.Appendix, § 901 et seq. See opinions of Judge Hincks in United States v. Friedman, D.C.Conn.March 25, 1943, 50 F.Supp. 584, and United States v. Sosnowitz & Lotstein, Inc., et al., D.C.Conn. March 25, 1943, 50 F.Supp. 586; and see United States v. Wright, D.C.Del.1943, 48 F.Supp. 687; Henderson v. Byran, D.C. Cal.1942, 46 F.Supp. 682; United States v. C. Thomas Stores, Inc., et al., supra, and the anti-prostitution statute of World War I, Act May 18, 1917, § 13, 40 Stat. 83, 50 U.S.C.A. § 226 note, McKinley v. United States, 249 U.S. 397, 39 S.Ct. 324, 63 L. Ed. 668.

Article I, Section 8, of the Constitution of the United States grants to the Congress the powers, in clause 1—"To lay and collect Taxes, Duties, Imposts, and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States * * *."; in clause 11, "To declare War, * * *"; in clause 12, "To raise and support Armies, * * *"; in clause 13, "To provide and maintain a Navy * * *"; in clause 18, "To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."

■ Whatever construction we place on clause 1, plainly ample authority is granted in the other clauses cited to sustain the control over the allocation of materials for defense placed in the President by the Second War Powers Act of 1942.

The power existing, are the means used in its exercise constitutional?

"Let the end be legitimate, let it be within the scope of the constitution and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional." McCulloch v. Maryland, 1819, 4 Wheat. 316, 421, 4 L.Ed. 579.

It is plain from the terms of the restriction order itself (Section 1407.912) that the limitations on slaughter for civilian sale of meats are directly related to the assurance of the availability of meats for the Army, the Navy, other governmental agencies and

countries whose support is found to be vital to the defense of the United States under the Lease-Lend Act, 22 U.S.C.A. § 411 et seq. That the supply of goods for military use, including food, is one of the first considerations for the successful conduct of military operations admits of no argument. Moreover, in a war on so vast a scale as the present conflict, with a large and increasing proportion of our civilian population directly employed in the production of weapons for the armed forces, adequate food supplies for the civilian population are essential to the successful prosecution of the war.

There can be no doubt, therefore, that the Congress has the power to provide by legislation for the production and delivery of food for the armed forces and to provide likewise for the equitable distribution of the remaining food supply to the civilian population if such legislation reasonably appears to the Congress to be necessary, and if the means chosen are reasonably adapted to that end.

The Court cannot say that it appears on the face of the information, the underlying regulations or the underlying statutes in this case that there is no military need for the conservation and regulation of the preparation of finished meat products for civilian use, or that the quota provisions set forth in Meat Restriction Order No. 1 are not reasonably adapted to meet that need. Indeed, the need is plain, and as I have said, means better adapted to meet it than those chosen do not readily suggest themselves.

I must conclude that the power lies in the Congress, under the war powers granted it by the Constitution, to regulate and control the supply of food during time of war in order to facilitate the prosecution of the war. In Sections 2(a) (2) and 2(a) (8) of the Second War Powers Act of 1942, the Congress has exercised this power by providing for allocation by the President through an appropriate department, agency or officer of the Government. Executive Order 9125 of April 7, 1942, Sections 1, 3, 3(a), 3(b) and 3(d), Directives #1 and #1-M of the War Production Board have designated the Administrator of the Office of Price Administration as the appropriate officer of the Government, and the Administrator by Meat Restriction Order No. 1 has undertaken to carry out the allocation power.

Whether the Congress, the President, the War Production Board and the Administrator have each taken the best of all possible means is not before the Court. The power is granted to the Congress by the Constitution. The means are reasonably adapted to the end sought. The meat restriction order is valid on its face and must be obeyed.

The demurrer is in all respects overruled.