### GRAY et al. v. COMMODITY CREDIT CORPORATION.

### No. 291.

District Court, S. D. California, N. D.

Nov. 1, 1945.

David E. Peckinpah, of Fresno, Cal., Roger R. Walch, of Hanford, Cal., and Harold M. Child and L. N. Barber, both of Fresno, Cal., for plaintiffs.

John F. Sonnet, Acting Head, Claims Division, of New York City, and Charles H. Carr, U. S. Atty., and William W. Worthington and Ronald Walker, Asst. U. S. Attys., all of Los Angeles, Cal. (Arnold Levy, Sp. Asst. to the Atty. Gen., and Frederick Chait and Cecelia Goetz, Attys., Department of Justice, all of Washington, D. C., of counsel), for defendant.

YANKWICH, District Judge.

I. The Facts Underlying the Controversy

In 1943, the defendant, Commodity Credit Corporation, a corporation, the stock of which is owned entirely by the Government of the United States, was made an agency of the War Food Administration. In August, 1944, it made a contract with the Raisin Producers Association, a nonprofit corporation, organized under the laws of California, by which the Association agreed to act as its agent for the purchase of (a) raisin variety grapes not suitable for conversion into standard quality raisins, (b) damaged or substandard quality raisins, and (c) such quantities of raisin variety grapes as were in excess of the amount determined by the War Food Administration to be needed for conversion into raisins.

The contracts were entered into in order to carry into effect the 1944 raisin program adopted by the War Food Administration, the purpose of which was to secure adequate supplies of raisins and Zante Currant grapes to meet war-time needs.

This was to be achieved by encouraging the production of raisin variety grapes and Zante Currants and thus ensuring their conversion into raisins sufficient in amount to meet military and esssential civilian raisin requirements.

The controversy turns on the interpretation of section 5 of the contract entered into by the defendant as purchaser and several thousand growers of raisin variety grapes. The plaintiffs and the group they represent are growers of Muscat grapes. This action, which was originally instituted in the Superior Court of the State of California, and later removed to this court, seeks to secure a declaration as to the meaning of this section of the contract, which reads:

"1. An incentive payment at the rate of $10 per ton shall be made to each Producer of sun dried raisins (not including sulphur bleached raisins) and each Producer of Zante Currants for the quantity of such sun dried raisins and Zante Currants produced in 1944 and sold to Packers prior to March 1, 1945, provided, however, that if the available fund is insufficient to make payments at the rate of $10 per ton, such fund will be distributed to such Producers on a pro rata basis.

"2. The balance of the fund, if any, will be distributed pro rata on a fresh tonnage basis to all Growers of raisin variety grapes and Zante Currant Grapes grown in 1944, in Kern, Kings, Tulare, Fresno, Madera, Merced, Stanislaus, and San Joaquin Counties in the State of California; the number of tons determined to have been produced by each Grower will include only grapes which have been converted into raisins or Zante Currants and sold to Packers prior to March 1, 1945. Grapes sold to dehydrators for conversion into raisins, Grapes and substandard or damaged Grapes and Raisins sold to WFA and Grapes sold to canneries to be used in the manufacture of fruit cocktail. The conversion factor for Sultana and Thompson Seedless raisins to fresh grapes will be 1 to 4; Muscats 1 to 3.75 and Zante Currants 1 to 6. Partially dried and substandard raisins will be converted to green tons by dividing the price paid by Commodity for a given lot by the applicable price in Schedule A at 79% moisture and multiplying that figure by the number of tons in the lot."

The nature of the controversy calls for a somewhat detailed statement of the facts underlying it. Fortunately, we are spared the labor of sifting the facts from controverted testimony. For counsel, *commendably,* have stipulated to the facts in the case. So we shall resort to this stipulation of facts on file and to summaries of portions of it contained in the briefs of counsel, checked against the stipulation, for a broader outline of the background of the controversy.

At the outset, it should be borne in mind that this is not a dispute between certain persons and a private corporation, government owned. The entire action stems from an exercise of war-time powers. So it is well to state generally the nature of the war powers of the Congress of the United States. These may well be gathered from the following two statements from decisions of the Supreme Court.

"Upon the exercise of these powers no restrictions are imposed. Of course the power to declare war involves the power to prosecute it *by all means and in any manner in which war may be legitimately prosecuted.*" [1] (Emphasis added).

"The Constitution * * * declares that one of its purposes is to 'provide for the common defense.' In express terms Congress is empowered 'to declare war.' which necessarily connotes the plenary power to wage war with all the force necessary to make it effective; and 'to raise * * * armies,' * * * which necessarily connotes the like power to say who shall serve in them and in what way. *From its very nature, the war power, when necessity calls for its exercise, tolerates no qualifications or limitations, unless found in the Constitution or in applicable principles of international law.*" [2] (Emphasis added)

These premised, we turn to more specific facts relating to the raisin industry.

Raisins produced in this country are made almost exclusively from three varieties of grapes,—Muscat, Thompson and Sultana,—generally known as "raisin variety grapes." Most raisins are produced

---

[1] Miller v. United States, 1870, 11 Wall. 268, 305, 20 L.Ed. 135. And see, United States v. Chemical Foundation, 1926, 272 U.S. 1, 10, 47 S.Ct. 1, 71 L. Ed. 131.

[2] United States v. Macintosh, 1931, 283 U.S. 605, 622, 51 S.Ct. 570, 574, 75 L. Ed. 1302. And see, Highland v. Russell Car & Snowplow Co., 1929, 279 U. S. 253, 262, 49 S.Ct. 314, 73 L.Ed. 688.

by growers through the natural process of sun-drying their grapes. When grapes have been so dried, they become "natural condition raisins." They are then sold to packers, for stemming, cleaning, and, in some instances, seeding. When so treated, they become "processed raisins." Because of their high nutritional value, their relative nonperishability, and the ease with which they can be packed and shipped, raisins (and Zante Currants) are an essential war-time food item, of greater importance than fresh grapes.

To stimulate the production of the quantity of raisin variety grapes needed to meet estimated military and civilian raisin requirements for 1944, the War Food Administrator, on June 1, 1944, announced grower support prices on natural condition raisins of $180 per ton for Thompson and Sultana, and $195 per ton for Muscat. These support prices were fixed at the same level as the ceiling price established by the Office of Price Administration on grower or producer sales of natural condition raisins. Additionally, in order to enable packers to pay growers the price so determined and still receive a reasonable profit on the resale of processed raisins, the defendant entered into a program of subsidy payments to packers. All growers of raisin variety grapes, including the plaintiffs and those for whose benefit the action is brought, were thus assured of obtaining the ceiling price for natural condition raisins which they produced from their grapes.

Cognizance was also taken of the fact that raisin variety grapes have, in the past, been utilized in substantial quantities for purposes other than conversion into raisins, —principally for beverage and table uses,— and that a similar diversion of grapes into nonraisin uses, in 1944, would have resulted in a shortage of grapes for the essential raisin use. So, in order to meet the estimated military and civilian raisin requirements, it was deemed necessary to regulate the disposition and use of such grapes, in order to obtain their maximum possible utilization for conversion into raisins. Accordingly, on July 20, 1944, the War Food Administrator issued an order[3] placing restrictions on the sale, delivery, purchase and use of the 1944 crop of raisin variety grapes and Zante Currant grapes.

War Food Order 17, as so amended, imposed no limitation on the conversion of raisin variety grapes into raisins by sun-drying, or on sales to dehydrators for such conversion. Except as hereafter indicated, however, the order did not permit any other disposition of raisin variety grapes by the grower. In substance, therefore, the order prohibited grower sales of fresh grapes to any trade outlet other than dehydrators who would convert them into raisins. These restrictions were designed to ensure that grapes would be devoted to raisin uses, to the maximum extent possible.

It was recognized, however, that there would be some raisin variety grapes which, either because of their condition or for other reasons, would ultimately not be converted or convertible into raisins. To permit the unrestricted sale of this residue of raisin variety grapes would have involved danger of diversion to other uses of grapes actually needed for raisins. Section 1407.2(b) of War Food Order 17 accordingly permitted the sale of grapes to the Office of Distribution of the War Food Administration (or to a corporate agency thereof), and so created an outlet for this residue. The provision permitting such sales of fresh grapes made no other outlet legally available. In this manner, while an outlet was provided for growers, at the same time, control was maintained over the disposition of grapes for nonraisin use, with a view of avoiding diversion into less essential uses of grapes needed for raisin purposes. The defendant, a Delaware corporation, is a corporate agency of the Office of Distribution.

A grower, therefore, had three principal legal ways of disposing of his grapes:

(1) He could convert them into raisins and sell them in that form; (2) he could sell them to a dehydrator for conversion into raisins; or (3) he could sell them to the Office of Distribution.

To carry into effect the third alternative, the defendant undertook to buy from growers *who could not or did not wish* to utilize either of the first two outlets: (a) Raisin variety grapes not suitable for conversion into standard quality raisins; (b) damaged or substandard quality raisins; and (c) such quantities of raisin variety grapes as might be produced in excess of the amount determined by the War Food Administration to be needed for conversion into raisins.

Under the purchase program, any grower, including the plaintiffs, who wished to

---

[3] Amendment 5 to War Food Order 17, 9 F.R. 8768.

dispose of his grapes other than by sun-drying them into raisins or by sale to a dehydrator, made application to the War Food Administration Office in Fresno, Cal. The defendant purchased grapes only if the War Food Administration, after receiving such application, approved the sale. After such approval, the grower went to the office of the defendant's agent and there signed a contract in standard form. *All growers who sold grapes to the defendant, including the plaintiffs, followed the same procedure and signed identical contracts.*

The defendant entered into over 2,000 such contracts with growers to purchase fresh raisin variety grapes of the 1944 crop. Only one contract was signed with each grower, covering all the grapes he was to sell to the defendant, regardless of whether he was selling one or more varieties. Approximately 12% of the growers sold Sultanas, 27% sold Thompsons, and the remainder sold Muscats. The contract price which the defendant paid to growers for their grapes was $43 per fresh ton for Thompsons and Sultanas, and $50 per fresh ton for Muscats. These prices were equivalent, on a conversion basis, to the O.P.A. ceiling price on grower sales of natural condition raisins of the same variety. They were also the same, net, as the highest price paid by dehydrators and dryyard operators for fresh grapes sold to them.

In order to stimulate the maximum production of raisin variety grapes, the defendant, *under the contract*, paid the same price for *substandard grapes and damaged raisins, as it did for standard quality grapes.* The growers were thus encouraged to grow and dry their grapes, being protected against loss on substandard fresh grapes as well as against loss due to weather or other conditions after the grapes were placed on trays for drying.

The defendant resold the grapes which it purchased under these contracts, principally to wineries, at a price in excess of that which it paid to the growers for them. Resales were made on the basis of bids which the defendant solicited and received. Bidders had no knowledge of the quantities of each variety available for resale. The bids received, however, showed no substantial difference in demand (either on a price or quantity basis) among the several varieties of grapes so resold. Winery bids for Muscats averaged not more than $5 per ton higher than for Thompsons. In quan-tity, the demand for Muscats was only slightly greater than the demand for Thompsons.

From these sales of grapes acquired from growers, the defendant realized net proceeds of approximately $8,850,000. This sum is "the fund" referred to in Section 5 of the contract.

Explanatory of the need for resorting to this method of control are certain other facts which are also uncontroverted.

Prior to the institution of Governmental war controls, in 1942, on the sale, use, or other disposition of raisin variety grapes, there was no large or consistent difference in the prices paid for such grapes by various trade outlets and for various uses. Prices varied from year to year, by variety and by utilization, the maximum variation in any year not exceeding $5 per ton, and averaging considerably less. With the imposition of the controls, in 1942, the quantity and proportion of raisin variety grapes going into nonraisin channels was reduced. With this reduction in supplies available for nonraisin uses, the demand in nonraisin channels increased, with the result that grapes sold for nonraisin use could command a substantially highter price than that paid by the trade for raisins (on a conversion basis) or for grapes sold to raisin channels. The ceiling price on natural condition raisins was a limiting factor, as a practical marketing proposition both on the return which growers could realize for drying their grapes and on the price which dehydrators and other purchasers were willing to pay for grapes acquired for conversion into raisins. Thus, a large disparity arose, and could be anticipated, between the return obtainable by a grower who converted his grapes into raisins, or who sold them for such conversion, and the return which could be obtained for sales to nonraisin outlets. This might result in the diversion of grapes by growers into nonraisin uses. It also presented the possibility that a grower whose grapes were devoted to the essential raisin use might derive a smaller relative financial return than the one whose grapes were devoted to a less important nonraisin use, in consequence of the market price differential favoring nonraisin uses.

This was one of the problems which confronted the Government and the growers in planning the raisin program for 1944, and which they sought to avoid. The matter was discussed at Government and trade

conferences held in Washington, D. C., and Fresno, California. during the spring and summer of 1944. The members of the Raisin Industry Advisory Committee to the War Food Administration, made up of growers, packers and other persons engaged in the raisin industry selected by the War Food Administration, recommended that any profit derived from the sale of raisin variety grapes for nonraisin use (principally beverage and table use) over and above that which could be obtained on such grapes if dried into raisins, be pooled and distributed equally among all raisin variety grape growers in proportion to their total production. *The members of the Committee rejected, when making their recommendation, a proposal by a Muscat grower, one Stuart Knox Thomas, that the profits on such sales of each variety of grapes be kept in separate pools and be distributed only among growers of that particular variety, in proportion to their production.*

The raisin program for 1944 was adopted in the light of these facts. The stipulation of facts states the following as the purposes and considerations of the War Food Administration in adopting War Food Order 17:

(1) By restricting the sale and use of raisin variety grapes and Zante Currant grapes: to secure the maximum utilization thereof for producing raisins to meet estimated military and civilian requirements:

(2) By permitting the sale of fresh raisin variety grapes and Zante Currant grapes to the Office of Distribution only (except on special authorization); to provide an outlet for the residue of such grapes not converted into raisins, while maintaining control over their disposition for nonraisin uses, with a view of avoiding diversion into such uses of grapes needed for raisin use.

To achieve these purposes, the War Food Administration and defendant approved and adopted the purchase program and the provisions of Section 5 of the Contract. The stipulation details the considerations which led to their adoption in this manner:

(1) Incentive payments: to encourage growers to sun-dry their raisin variety and Zante Currant grapes in order to stimulate the production of raisins;

(2) Purchase of substandard grapes and damaged raisins at prices equivalent to those paid for standard quality grapes and raisins; to encourage maximum production by protecting growers against loss on substandard fresh grapes and against loss due to weather or other conditions after their grapes were placed on trays for drying;

(3) Distribution of fund among all growers: to avoid a situation in which it would be relatively disadvantageous for a grower to dispose of his grapes (or Zante Currants) in raisin channels; to eliminate any financial incentive to divert grapes from raisin channels; to avoid the possibility that a grower of raisin variety grapes whose grapes were devoted to the essential raisin use would derive a smaller relative financial return than one whose grapes were devoted to a less important nonraisin use, in consequence of the market price differential favoring nonraisin uses.

The object, therefore, was (1) to stimulate the production of raisins, (2) to eliminate the incentive to divert raisin variety grapes to nonraisin channels, and (3) to encourage those cooperating in the program, by insuring against a diminished income through such co-operation.

## II. The Legal Principles Applicable

### (A) *Pool or Pools:*

The plaintiffs are growers of Muscat grapes, who have sold their grapes to the defendant, under the contract here under discussion. It is their contention that Section 5 of the Contract is indefinite, and that its correct legal interpretation does not call for a distribution of the fund of $8,850,000 *equally among all classes of growers who sold their raisins, in proportion to their production,* but requires that the profits from the sale of each variety of grapes be distributed to growers of that particular variety *only,* in proportion to their production. The "balance of the fund", of which the contract speaks, would constitute, therefore, *not one pool, but separate pools,* each distributable to the variety of grapes in it. And the plaintiffs, *as Muscat growers,* would have distributed to the Muscat growers, the pool derived from the sale of their variety only, in accordance with their production.

Anticipating the contention that Section 5 of the contract does not, by its wording, warrant such interpretation, the plaintiffs, *at the very outset,* assert that the section is indefinite and uncertain and that the court should supply to it a definiteness and certainty which would warrant its interpretation in accordance with the plaintiffs' contention.

Courts, in interpreting contracts, may give definite meaning to terms which are not such.[4] But this is only true when such definiteness is inherent in the scope and purpose of the contract read as a whole. Courts will not, under the guise of giving definiteness to a contract, write a new one.[5] The very authority relied on by the plaintiff states this principle very tersely: "Neither abstract justice nor the rule of liberal construction justifies the creation of a contract for the parties *which they did not make themselves or the imposition upon one party to a contract of an obligation not assumed. Courts cannot make for the parties better agreements than they themselves have been satisfied to make or rewrite contracts because they operate harshly or inequitably as to one of the parties.* If the parties to a contract adopt a provision which contravenes no principle of public policy and contains no element of ambiguity, the courts have no right, by a process of interpretation, to relieve one of them from disadvantageous terms which he has actually made." [6] (Emphasis added)

An analysis of the contract indicates that the object was to secure, through war-time control of distribution, a certain object,—namely, the forcing of raisin variety grapes into channels deemed most essential. To this end, certain methods were resorted to. A standard price was agreed on for substandard or excess quantities of raisins. The purchases were made only from such growers as signed a written contract with the defendant. For these, it paid a price equivalent to standard quality grapes and raisins. In addition to this, the contract called for an incentive payment at the rate of $10 per ton to each producer of sun dried raisins or Zante Currants for the quantity of such sun dried raisins and Zante Currants produced in 1944, and sold to packers prior to March 1, 1945. The profits on the resale, after paying the purchase price and incentive price, was to be distributed pro rata on a fresh tonnage basis to all growers of raisin variety grapes and Zante Currant grapes grown in 1944, in Kern, Kings, Tulare, Fresno, Madera, Merced, Stanislaus, and San Joaquin Counties. Provision was also made for a conversion factor for grapes sold to dehydrators,—the factor being established with reference to each variety of grapes. The latter provision is the sole one in the contract which considers varieties specifically. It does this in order to equalize the cost of all growers,—it being a fact that certain grapes lose more in the drying process than others. Hence, the desire to equalize the burden. In all other respects,—in the guaranty of the raisin price established by the Office of Price Administration, in the incentive payment, as well as in the disposition of the surplus, the grapes, whatever their variety, are treated as one. And a method of conserving food for war purpose is arrived at by encouraging the conversion of grapes into the much needed raisins, under a price guaranty. *Either Section 5 of contract means this or it means nothing else.* For nowhere in its language is there to be found a clause, phrase, or word which would justify the creation of separate pools out of the surplus fund. The contract specifically says that the balance of the fund shall be distributed pro rata to all growers of raisin variety grapes. To read it as plaintiffs would read it, we would have to change the word "all" into "growers of raisin variety grapes according to variety." Counsel press upon us the words *pro rata*. They say that *pro rata* merely means "in proportion to." Webster's New Unabridged Dictionary defines *"pro rata"* as "in proportion, proportionately, according to share, interest or liability of each." The verb "prorate" is defined as "to divide according to a certain part in proportion." We need not consider cases where the words *pro rata* had been given a special meaning because the context of a contract called for it. We must assume that in this contract, the words were used in the ordinary sense. There might be room for argument, had the draftsmen of the contract stopped with the words "will be distributed." For then it might be claimed that the basis for distribution was missing and a distribution "pro rata to all growers of raisin variety grapes" might be held to be indefinite as not giving

---

[4] 12 Am.Jur., Contracts, § 239.

[5] 12 Am.Jur., Contracts, § 228. Apposite are these words of the Fourth Circuit Court of Appeals in Spring Coal Co. v. Keech, 1916, 239 F. 48, 51, L.R.A.1917D, 1152: "Courts of equity no more than courts of law have power to make contracts for persons or corporations, nor can courts *substitute their judgment for the judgment of the parties to a contract.* It is the duty of courts to construe and to enforce valid contracts *as the parties made them."* (Emphasis added.)

[6] 12 Am.Jur., Contracts, § 228, p. 550.

us *the proportion for distribution*. But here the basis for the pro rata distribution is made "a fresh tonnage basis." So that the makers of the contract have provided not only for a distribution but have also given us the part, in proportion (rata, parte), upon which the distribution is to be made.

Section 5 of the contract aims to distribute the profits derived from the sale of grapes and raisins purchased under the agreement. And the specific allocations of proceeds,—such as expenses in carrying out the agreement, the guaranteed incentive price, as well as the balance of the fund, are all treated as one, *which can only be the case when we are dealing with a single pool.*

A pooling method of handling a commodity is not new in California. The State Raisin Control Program of 1940, adopted under the California Agricultural Prorate Act, St.Cal.1933, p. 1969, as amended, and which received the approval of the Supreme Court in Parker v. Brown,[7] adopted a pooling method of disposing of surplus raisins, at a time of economic distress.

■ So that the contract considered, as it must be, in the light of the circumstances under which it was entered into, shows an attempt *to canalize* certain types of grapes into raisin channels by offering inducements to growers to send them into these channels, guaranteeing them the maximum price allowed under war time regulations of the Office of Price Administration, and then agreeing to distribute to all in the pool, *on a definite basis,* any surplus left in the fund, derived from the resale of the grapes. In construing a contract, the circumstances which surrounded and led to its execution may be considered, in order to ascertain its true meaning. But this cannot be done for the purpose of adding new and distinct undertakings not in the contemplation of the parties. As said in an old case: "If there be ambiguity in the contract, resort may be had to the situation of the parties, and the circumstances under which it was entered into, for the purpose, not of changing the writing, but of furnishing light by which to ascertain its actual significance."[8]

■ Here the circumstances surrounding the execution of the contract, and the establishment of the method of disposal provided for in Section 5, all converge in compelling the interpretation which the defendant has placed upon it. If any contemporary fact warranting such interpretation were needed we have the undisputed fact that a provision which would have created separate pools, as plaintiffs would have us do, for the distribution of the surplus to growers of different varieties of grapes according to production, was actually made before the Advisory Committee and was rejected by it before the program was agreed upon.

It follows that:

(1) The interpretation contended for by the plaintiffs is not borne out by the wording of Section 5, when it is considered in the light of accepted legal principles;

(2) A contemporaneous proposal to word the section as plaintiffs would have it read was actually rejected; and finally,

(3) To interpret the words "balance of the fund" in Section 5 to mean *not one but several pools* would require this Court to rewrite the contract and to force upon the defendant an obligation which it did not assume.

(B) *The Validity of Pooling:*

Very earnestly the plaintiffs contend that if we interpret Section 5 of the Contract as just stated, we are sanctioning a violation of the due process guarantee of the Constitution. Const.Amend. 5. While plaintiffs do not challenge *directly* the right of the War Food Administration to establish this type of control, such challenge is implicit in the insistence of the plaintiffs that the war powers are not at issue and that this law suit is just a controversy between individuals and a private corporation, which, although owned entirely by the United States is, after all, *just a private corporation.* It is for this reason that I insisted at the outset that the controversy *cannot be* dissociated from the war powers, under which the entire program of raisin control was inaugurated, and of which the particular contract was merely a part. The integration of the defendant into the War Food Administration was a part of an Ex-

[7] Parker v. Brown, 1943, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315. The minority views of the writer on the validity of this method of state control were sustained by the Supreme Court. See dissenting opinion in Brown v. Parker, D.C.Cal., 1941,

39 F.Supp. 895. The Prorate Act itself was held constitutional in Agricultural Prorate Commission v. Superior Court, 1936, 5 Cal.2d 550, 55 P.2d 495.

[8] Walker v. Brown, 1897, 165 U.S. 654, 668, 17 S.Ct. 453, 458, 41 L.Ed. 865.

ecutive Order which created the Administration[9]. And the President's Executive Order distinctly stated that the integration was made under the authority vested in the President by the Constitution of the United States and the First War Powers Act of 1941, 50 U.S.C.A.Appendix, § 601 et seq. Because this fact is all-important,—much as plaintiffs might desire to overlook it, in order to prevent the application to the case of the broader principles of social and economic control permissible in war time,—we reproduce the preamble and the first section of this Executive Order:

"Executive Order No. 9322 of March 26, 1943, entitled 'Centralizing and Delegating Authority with Respect to the Production and Distribution of Food,' is hereby amended to read as follows:

" 'By virtue of the authority vested in me by the Constitution and the statutes of the United States, particularly by the First War Powers Act, 1941, as President of the United States and Commander in Chief of the Army and Navy, and in order to assure an adequate supply and efficient distribution of food to meet war and essential civilian needs, it is hereby ordered as follows:

" 'Section 1. The Food Production Administration (except the Farm Credit Administration), the Food Distribution Administration, the Commodity Credit Corporation, and the Extension Service, together with all their powers, functions, and duties, are hereby consolidated within the Department of Agriculture into a War Food Administration, to be administered under the direction and supervision of a War Food Administrator. The Administrator shall be appointed by the President and shall be directly responsible to him.' "

So the fact to be borne in mind is that exercising his constitutional powers as the Commander-in-Chief of the Army and Navy and the special war time powers conferred by the First War Powers Act, the President welded certain governmental agencies into a War Food Administration to

be administered under the direction of a War Food Administrator to be appointed by him. And the object of the consolidation was not merely to exercise *generally* his constitutional and special war powers, but also, *and more specifically,* as the preamble states: *"to assure an adequate supply and efficient distribution of food to meet war and essential civilian needs."* (Emphasis added)

The upshot of the matter is this: The President exercising his constitutional powers in war time, and with the added authority conferred on him by special war time legislation, took several agencies which had heretofore exercised certain powers, both in time of peace and in time of war, and consolidated them into one for the avowed object of assuring an adequate supply and distribution of food to meet war and essential civilian needs. One of the agencies thus integrated into the greater one was the defendant, a corporation, the stock of which is entirely owned by the Government, and which had been created, in peace time, to effectuate other governmental purposes. And to insure that no question shall arise from the fact that some of the agencies thus unified came under the Secretary of Agriculture, and others now transferred to the War Food Administrator had been exercised by other agencies, the order provided that each could exercise the powers vested in the other either by statute or otherwise, and deprived prospective objectors of the right to challenge the act of either on the ground of lack of jurisdiction. There is, therefore, no substance to the argument that this is a dispute between certain individuals and a private Delaware corporation, the measure of the powers of which is to be sought in the law applicable to private corporations. Here we have a Government corporation, organized in peace time not merely being used for the exercise of war time functions, but made a part of a greater whole to be known as the War Food Administration, in order to carry ·into effect not only general and statutory war powers of the Presi-

9 Executive Order 9334, 50 U.S.C.A.Appendix, § 601 note, 8 F.R. 5423, issued on April 19, 1943.

Its previous history was this: It was created by Executive Order No. 6340, October 16, 1933. It was continued in existence by Acts of Congress (49 Stat. 4; 50 Stat. 5; 53 Stat. 510). Reorganization plan No. 1 (53 Stat. 1429, 5 U.S.C. A. § 133t note), approved by Act of Congress (53 Stat. 813), which became effective on July 1, 1939, transferred it to the Department of Agriculture, to be "administered in such Department under the general direction and supervision of the Secretary of Agriculture." Executive Order No. 8219, dated August 7, 1939, gave the exclusive voting rights of its capital stock to the Secretary of Agriculture (4 F.R. 3565).

dent, but a definite program of food production and distribution. So that, in effect, the plaintiffs are attacking the power of the War Food Administration, which organized and carried to full fruition, through its various agencies, the raisin program of 1944. And this is done in an action to which the War Food Administrator is not a party, and which seeks the distribution of the funds derived from the program, for the inauguration of which sole authority lies in the Executive Order, whch incorporated the defendant into the War Food Administration for war purposes.

 It is apparent from what precedes that such a challenge must fail. The power to restrict profits or channels of trade in war time is beyond dispute. And it is not a constitutional infirmity that such restrictions may result in a loss or interfere with private contractual rights.[10] Even in peace time, in the exercise of control over interstate commerce, restrictive measures were applied to the shipment of farm products into interstate commerce. The violation of such restrictions was heavily penalized. Growers or shippers who were not allowed to deal freely in interstate commerce, but were limited to weekly quotas could complain of loss through such restrictive marketing. Yet courts sustained such powers in the exercise of the plenary powers of the Congress to regulate commerce between the States.[11] Shall it be said that an agency of the Government, endeavoring to insure a bountiful supply of an essential food, is more restricted in the exercise of its war powers than the Secretary of Agriculture, acting with an advisory committee, is under the Agricultural Marketing Act, 12 U.S.C.A. § 1141 et seq.?[12]

The pooling of raisin grapes, even in peace time, has been recognized as an accepted means of control.[13] So have other peace time regulations aiming to equalize risks through common funds, in order to achieve desirable social benefits or controls. Illustrative are: workmen's compensation[14], bank deposit insurance[15], distribution of benefits in the Transportation Act, 49 U.S.C.A. § 71 et seq.[16], and marketing of milk[17].

In the milk pool case, the defendants argued, *as do the plaintiffs here,* that their property *was being taken away and given to others.* The argument and the answer are tersely stated by Mr. Justice Reed in these words:

"The defendants' objection to the equalization pool, here considered, is not to the disbursements from the fund for expenses of standby or marketing services authorized by Article VII, Sections 5 and 6, concerning which we hold the handler has no standing to complain. It is to the alleged deprivation of liberty and property accomplished by the pooling requirement in taking away from the defendants their right to acquire milk from their patrons at the minimum class price, according to its use,

---

[10] Taylor v. Brown, 1943, Em.App.1943, 137 F.2d 654, 659. And see cases under Note 19.

On the power of the Government to curtail individual rights in war, see: Kiyoshi Hirabayashi v. United States, 1943, 320 U.S. 81, 99-102, 63 S.Ct. 1375, 87 L. Ed. 1774; Toyosaburo Korematsu v. United States, 1944, 323 U.S. 214, 217-219, 65 S.Ct. 193, 195:

"Hardships are part of war, and war is an aggregation of hardships. All citizens alike, both in and out of uniform, feel the impact of war in greater or lesser measure. Citizenship has its responsibilities as well as its privileges, and in time of war the burden is always heavier."

[11] Edwards v. United States, 1937, 9 Cir., 91 F.2d 767. And see cases under Note 7.

[12] See, Highland v. Russell Car & Snow Plow Co., 1929, 279 U.S. 253, 49 S.Ct. 314, 73 L.Ed. 688; L. P. Steuart & Bros. v. Bowles, 1944, 322 U.S. 398, 64 S.Ct. 1097, 88 L.Ed. 1350; Henderson v. Bryan, 1942, D.C.Cal., 46 F.Supp. 682 (per Harrison, J.); Henderson v. Kimmel, 1942, D.C.Kan., 47 F.Supp. 635, 641; United States v. Beit Bros., 1943, D.C.Conn., 50 F.Supp. 590; United States v. Randall, D.C.N.Y., 50 F.Supp. 139; and see cases under Notes 7, 11 and 19.

[13] Parker v. Brown, 1943, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315; Agricultural Prorate Commission v. Superior Court, 1936, 5 Cal.2d 550, 55 P.2d 495; Dickey v. Raisin Proration Zone 1, 1944, 24 Cal. 2d 796, 151 P.2d 505, 157 A.L.R. 324.

[14] Mountain Timber Co. v. State of Washington, 1917, 243 U.S. 219, 37 S.Ct. 260, 61 L.Ed. 685, Ann.Cas.1917D, 642.

[15] Noble State Bank v. Haskell, 1911, 219 U.S. 104, 31 S.Ct. 186, 55 L.Ed. 112, 32 L.R.A.,N.S., 1062, Ann.Cas.1912A, 487; Abie State Bank v. Weaver, 1931, 282 U. S. 765, 51 S.Ct. 252, 75 L.Ed. 690.

[16] New England Divisions Case [Akron, C. & Y. Ry. Co. v. United States], 1923, 261 U.S. 184, 43 S.Ct. 270, 67 L.Ed. 605.

[17] United States v. Rock Royal Cooperative, 1939, 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446.

and forcing the handlers to pay their surplus, over the uniform price, to the equalization pool instead of to their patrons. This argument assumes the validity of price regulation, as such, but denies the constitutionality of the pooling arrangement because handlers are not at liberty to pay the producer in accordance with the use of the producer's milk, but must distribute the surplus to others whose milk was resold less advantageously. It is urged that to carry this principle of contribution to its logical conclusion would mean that the wages of the employed should be shared with the unemployed; the highly paid, with the underpaid; and the receipts of the able, the fortunate and the diligent, with the incompetent, the unlucky and the drone.

"No such exaggerated equalization of wealth and opportunity is proposed. The pool is only a device reasonably adapted to allow regulation of the interstate market upon terms which minimize the results of the restrictions. It is ancillary to the price regulation, designed, as is the price provision, to foster, protect and encourage interstate commerce by smoothing out the difficulties of the surplus and cut-throat competition which burdened this marketing. In Mulford v. Smith [307 U.S. 38, 59 S.Ct. 648, 83 L.Ed. 1092], we made it clear that volume of commodity movement might be controlled or discouraged. As the Congress would have, clearly, the right to permit only limited amounts of milk to move in interstate commerce, we are of the opinion it might permit the movement on terms of pool settlement here provided.

*"Common funds for equalizing risks are not unknown and have not been considered violative of due process."*[18] (Emphasis added)

As the pooling method in the 1944 raisin program assured a market at a guaranteed price, although restricted, it is hard to see how it can be argued that a program of this character deprives *anyone* of property without due process of law. Of course, any program which delimits trade in commodities which one produces, harms someone. But if this were enough to invalidate restrictive marketing, the entire scheme of anti-deflation ordained by the Congress and put into effect by the President, under the First and Second War Powers Acts, would have been vulnerable. Yet, repeatedly, the Courts have sustained it and the administrative regulations carrying it into effect against protests that they interfered with private contracts or property rights, or were a denial of due process.[19] *Rightly.* For, if the Government, in waging war, can select the most fit of our young men and order them to the battle front to be killed, it certainly may, under the same constitutional powers, deprive a raisin grower of his right to trade freely in the commodity, by limiting his outlets.

(C) *Waiver:*

The plaintiffs and those whom they represent, desiring to dispose of their grapes through nonraisin channels, made application to the Office of War Food Administration in Fresno, Cal., under War Food Order 17 for authorization to do so. Prior

---

18 United States v. Rock Royal Cooperative, 1939, 307 U.S. 533, 571, 573, 59 S. Ct. 993, 1012, 83 L.Ed. 1446. Significantly, the Court, in this case, distinguished Thompson v. Consolidated Gas Utilities Corporation, 300 U.S. 55, 57 S.Ct. 364, 81 L.Ed. 510, and Railroad Retirement Board v. Alton Ry. Co., 295 U.S. 330, 55 S.Ct. 758, 79 L.Ed. 1468, on which plaintiffs here place so much reliance. (Opinion 307 U.S. at page 573, 59 S.Ct. 993, 83 L.Ed. 1446.) And see, Perry v. United States, 1935, 294 U.S. 330, 55 S.Ct. 432, 79 L.Ed. 912, 95 A.L.R. 1335; Carmichael v. Southern Coal Co., 1936, 301 U.S. 495, 57 S.Ct. 868, 81 L.Ed. 1245, 109 A.L.R. 1327; Railroad Commission of Texas v. Rowan & Nichols Oil Co., 1940, 310 U.S. 573, 60 S.Ct. 1021, 84 L.Ed. 1368.

19 Taylor v. Brown, 1943, Em.App., 137 F.2d 654, 659; Brown v. Wright, 1943, 4 Cir., 137 F.2d 484, 489; Lakemore Co.

v. Brown, 1943, Em.App., 137 F.2d 355; Chatlos v. Brown, 1943, Em.App., 136 F.2d 490; Montgomery Ward & Co. v. Bowles, 1943, Em.App., 138 F.2d 669; Taylor v. United States, 1944, 9 Cir., 142 F.2d 808, 817; Taylor v. Bowles, 1944, 9 Cir., 147 F.2d 824, 834. Even attempts like the one in the present case, to turn regulations of the type here involved into the taking of property without compensation and to apply to them principles obtaining in eminent domain cases, have been rejected. See: Wilson v. Brown, 1943, Em.App., 137 F.2d 348; Taylor v. Brown, 1943, Em.App., 137 F.2d 654, 659; Bowles v. Willingham, 1944, 321 U.S. 503, 517, 64 S.Ct. 641, 88 L.Ed. 892. The masterly summary of Mr. Justice Douglas in the case last cited on the power to inflict loss through valid regulation may well become a classic on the subject. See Part III, 321 U.S. at pages 516–519, 64 S.Ct. at pages 648, 649, 88 L.Ed. 892.

to September 19, 1944, the War Food Administration, when such application was received, made inquiry of an applying grower as to the reasons why he did not wish to convert his grapes into raisins by sun-drying. It generally did not approve the sale of his grapes to the defendant if they were of a quality suitable for conversion into raisins, in the absence of exceptional circumstances which made conversion into raisins impracticable for him. Circumstances of this character were high vines or trees shielding the sun, vines running north and south, rather than east or west, or difficulty in obtaining the necessary labor. If his acreage was substantial, an inspector would be sent out to inspect the grower's vineyard. If such inspection showed that the conversion of the particular grapes into raisins by sun-drying was impractical, the War Food Administration would inform him, generally by post-card, that he might sell them to the defendant. The same form of postcard, differing only as to name and date, was used for all growers. In the case of small acreages, such approval was given without inspection, if the reason given for not converting the grapes into raisins by sun-drying was satisfactory. Approval of the sale of substandard grapes and damaged raisins to the defendant was given on inspection and determination of their condition. On September 19, 1944, the War Food Administration, because of the lateness of the 1944 season, adopted a more liberal policy and growers making application for such distribution of grapes were generally authorized to enter into contracts with the defendants for the disposition of their raisins. Pursuant to this policy, the application of the plaintiffs was approved. And, after the sale, under the contract, the plaintiffs accepted payments under them.

On the basis of these undisputed facts, it is the contention of the defendant that the plaintiffs cannot question the agreement. I am forced to agree.

One who accepts the benefit of a statute or regulation waives the right to question its validity. Thus, one who accepted a temporary revocable license to broadcast was denied the right to challenge the constitutionality of the Act under which the application was made. The Court said:

"Having sought and secured a government permit or license with its attendant benefits, appellants obviously cannot later assert rights which were surrendered in order to secure the permit. Rome Ry. & Light Co. v. Floyd County, 243 U.S. 257, 37 S.Ct. 291, 61 L.Ed. 706.

"We find the legal proposition which is the basis of this conclusion, stated in Cooley on Constitutional Limitations, (8th Ed.) Vol. I, p. 369, as follows: 'So a person who obtains a license under a law, and seeks for a time to enjoy the benefits thereof, can not afterwards, and when the license is sought to be revoked, question the constitutionality of the act.' "[20]

This rule has received universal recognition in the courts of the United States [21]. And whether the courts were dealing with state or federal enactments, or regulations under them, they have denied relief to litigants who, after invoking a benefit or partial benefit under a statute, sought, thereafter, to question the validity of the enactment or regulation, or of another portion of it. This involves but the application of an equitable principle stated many years ago in a Kentucky case, and which has been quoted with approval by the Supreme Court: "Upon what principle of exalted equity shall a man be permitted to receive a valuable consideration through a stat-

---

[20] American Bond & Mortgage Co. v. United States, 1931, 7 Cir., 52 F.2d 318, 321.

[21] The following cases show that the doctrine has been applied *for at least a hundred years;* see McKinney v. Carroll, 1838, 12 Pet. 66, 70, 37 U.S. 66, 9 L.Ed. 1002; Grand Rapids & I. Ry. Co. v. Osborn, 1904, 193 U.S. 17, 29, 24 S.Ct. 310, 48 L.Ed. 598; Kansas City, M. & B. Ry. Co. v. Stiles, 1916, 242 U.S. 111, 117, 37 S.Ct. 58, 61 L.Ed. 176; Hurley v. Commission of Fisheries, 1921, 257 U.S. 223, 42 S.Ct. 83, 66 L.Ed. 206; St. Louis Malleable Casting Co. v. Prendergast Co., 1923, 260 U.S. 469, 472, 43 S.Ct. 178, 67 L.Ed. 351; Buck v. Kuykendall, 1925, 267 U.S. 307, 316, 45 S.Ct. 324, 69 L.Ed. 623, 38 A.L.R. 286; Frost v. Corporation Commission, 1929, 278 U.S. 515, 527, 49 S. Ct. 235, 73 L.Ed. 483; United States v. City and County of San Francisco, 1940, 310 U.S. 16, 29, 60 S.Ct. 749, 84 L.Ed. 1050; Yarnell v. Hillsborough Packing Co., 1934, 5 Cir., 70 F.2d 435, 438, 92 A. L.R. 1475; Moor v. Texas & N. O. R. Co., 1935, 5 Cir., 75 F.2d 386, 390; Nuckolls v. United States, 1935, 10 Cir., 76 F.2d 357, 360. And see cases under Note 22.

ute, procured by his own consent or subsequently sanctioned by him, or from which he derived an interest and consideration, and then keep the consideration, and repudiate the statute?" [22]

So, here, by entering into the contract and accepting payments under it,—including the incentive payments which two of the plaintiffs (Pitts and Brown) and many others for whom the suit is brought have accepted,—the plaintiffs have placed themselves in a position where they cannot question its validity.

**(D) Duress:**

Answering the plea of waiver advanced as one of the defenses to the complaint, the plaintiffs argue that their act in entering into the contract was duress, which should relieve them of its obligations. They argue that the restriction placed upon the grower of grapes, as enforced by the War Food Administration, amounted to duress.[23] Mr. Justice Jackson, in a recent opinion, has pointed to the difficulty which arises when courts are called upon to determine whether an act is

[22] Ferguson v. Landram, 1868, 5 Bush, Ky., 230, 96 Am.Dec. 350, as quoted in Daniels v. Tearney, 1881, 102 U.S. 415, 421, 26 L.Ed. 187; and see, Wall v. Parrott Silver & Copper Co., 1917, 244 U.S. 407, 412, 37 S.Ct. 609, 61 L.Ed. 1229; United Fuel Gas Co. v. Railroad Comm., 1929, 278 U.S. 300, 307, 308, 49 S.Ct. 150, 73 L.Ed. 390; White Oak Coal Co. v. United States, 1926, 4 Cir., 15 F.2d 474; Booth Fisheries Co. v. Industrial Commission, 1926, 271 U.S. 208, 211, 46 S.Ct. 491, 70 L.Ed. 908; North Dakota-Montana Wheat Growers Ass'n v. United States, 1933, 8 Cir., 66 F.2d 573, 578, 579, 92 A.L.R. 1484; United States v. Nudelman, 1939, 7 Cir., 104 F.2d 549, 552; and see, Note, "Estoppel to Contest Constitutionality of a Statute", 1935, 48 Harv. Law Rev. 988.

[23] The plaintiffs do not concede that they are attacking the regulation of the War Food Administration. They insist that they are merely challenging what was done to them by a private corporation, the Commodity Credit Corporation, created long before the beginning of the war. As we have already pointed out, this is an unrealistic approach to the problem. For what the Commodity Credit Corporation did cannot be dissociated from the war powers exercised by the War Food Administration, of which it was a part. It was used merely as an outlet to allow the growers to dispose of their grapes in a certain manner. As they could not dispose of the grapes without the permission of the War Food Administration, whatever act they were required to do in order to secure such permission was not the act of the Commodity Credit Corporation, but of the War Food Administration. However, we are not to be understood as holding that, for this reason, the action must fail because the War Food Administrator is not made a party. I have had many occasions to discuss the necessity for the presence, of a principal acting through subalterns, when it is

sought to set aside the act which the principal authorized. See my opinion in Acret v. Harwood, 1941, D.C.Cal., 41 F.Supp. 492, and my more recent opinion in Troy Laundry Co. v. Lockwood, D.C., 63 F. Supp. 384. And see: State of Minnesota v. Northern Securities Co., 1902, 184 U.S. 199, 256, 22 S.Ct. 308, 46 L.Ed. 499; Warner Valley Stock Co. v. Smith, 1896, 165 U.S. 28, 17 S.Ct. 225, 41 L.Ed. 621; Gnerich v. Rutter, 1924, 265 U.S. 388, 44 S.Ct. 532, 68 L.Ed. 1068; Webster v. Fall, 1925, 266 U.S. 507, 45 S.Ct. 148, 69 L. Ed. 411; State of Colorado v. Toll, 1925, 268 U.S. 228, 45 S.Ct. 505, 69 L.Ed. 927; Neher v. Harwood, 1942, 9 Cir., 128 F.2d 846. In the case last cited, the Ninth Circuit Court of Appeals recognizes as valid the distinction I made in Acret v. Harwood, supra, between cases in which the superior officer is and those in which he is not an indispensable party. (Note 1, 128 F.2d at page 852 of opinion.) I saw the distinguishing feature in "the 'power of the superior to act.'" The Circuit Court of Appeals considers this distinction as consonant with its own holding that where the constitutional authority of the superior officer to act is involved, he is not an indispensable party. This is the situation here. More, the fund, the distribution of which is in dispute, is entirely in the hands of the defendant. So that by the institution of this action, the Court was placed in a position where, if it sustained the position of the plaintiff, it could order a distribution of the fund in the manner requested by them, by a judgment directed to the defendant, its custodian. This point loses its significance in view of the other conclusions reached in the case. But I am adverting to it in order to indicate to counsel that I do not ground my decision upon the absence of the War Food Administrator as a party. Since this opinion was filed, the Supreme Court has clarified the subject in Mine Safety Appliances Co. v. Forrestal, 66 S.Ct. 219.

or is not voluntary. He wrote: "How far one by an exercise of free will may determine his general destiny or his course in a particular matter and how far he is the toy of circumstance has been debated through the ages by theologians, philosophers, and scientists. Whatever doubts they have entertained as to the matter, the practical business of government and administration of the law is obliged to proceed on more or less rough and ready judgments based on the assumption that mature and rational persons are in control of their own conduct."[24]

It may well be that Courts, at the present time, recognize as duress facts and circumstances which, by strict common law, would not have been considered such. There may be, in our complex society, such a thing as "business" or "economic compulsion." And such compulsion may *actually* exist despite the *appearance* of freedom of choice.[25] But an examination of the cases shows that where recognition was given to this principle to avoid the consequence of a contract, the Courts were dealing either with instances where, as a condition precedent to the right to question a particular act of an individual or a governmental agency, the person had to comply or go out of business,[26] or where contracts were entered into under threats of strikes[27], or there were other forms of act-

ual threats which resulted in a person parting with property or money to avoid a greater harm or penalty.[28] But it is idle to speak of duress when we are dealing with a contract entered into with a war agency exercising, in war time, under the authority of the Congress, powers unknown in peace time and relating to food production. The War Food Administration had the power to prohibit the use of grapes for raisin or wine purposes altogether, as the War Production Board had the power to, and did prohibit, the manufacture of automobiles and other commodities, and the use of grains for the making of alcoholic liquors. The War Food Administration, in pursuance of its policy, could have applied to its own use all the raisins. Of course, it would have had to pay just compensation.[29] In determining what just compensation would be, the War Food Administration could have been guided by the Office of Price Administration which might have fixed a price for raisins which really did not compensate the grower for the cost of production.[30] Here, as already stated in the factual part of this opinion, the technic adopted left the grower several alternatives in disposing of his grapes: (1) He could convert them into raisins and sell them in such form; (2) he could sell them to a dehydrator for conversion into raisins; and (3) he could sell them to the Office of Distribu-

24 Gregg Cartage & Storage Co. v. United States, 1942, 316 U.S. 74, 80, 62 S.Ct. 932, 935, 86 L.Ed. 1283.

25 See, The Eliza Lines, 1895, 199 U.S. 119, 130, 131, 26 S.Ct. 8, 50 L.Ed. 115, 4 Ann.Cas. 406; Union Pacific Ry. Co. v. Public Service Corporation, 1918, 248 U.S. 67, 70, 39 S.Ct. 24, 63 L.Ed. 131, 17 Am.Jur., Contracts, §§ 6, 7.

26 Atchison, etc. Ry. Co. v. O'Connor, 1912, 223 U.S. 280, 32 S.Ct. 216, 56 L. Ed. 436, Ann.Cas.1913C, 1050; Union Pacific Ry. Co. v. Public Service Commission, 1918, 248 U.S. 67, 69, 70, 39 S.Ct. 24, 63 L.Ed. 131; Oceanic Steam Nav. Co. v. Stranahan, 1909, 214 U.S. 320, 321, 29 S.Ct. 671, 53 L.Ed. 1013.

27 17 Am.Jur., Duress and Undue Influence, § 7.

28 Under the latter category come the cases cited by the plaintiffs: Rose v. Owen, 1908, 42 Ind.App. 137, 85 N.E. 129; Parmentier v. Pater, 1885, 13 Or. 121, 9 P. 59; Young v. Hoaglund, 1931, 212 Cal. 426, 298 P. 996, 75 A.L.R. 654; St. Louis & S. F. Ry. Co. v. Gorman, 1909, 79 Kan. 643, 100 P. 647, 28 L.R.A.,N.S., 637.

29 Constitution of the United States, Amendment 5.

30 The adequacy of the price is not in question here. But many complaints have been heard, both in and out of court, that some prices fixed by the Office of Price Administration were less than the cost of producing a commodity or rendering a service. Yet we know of no case where anyone has actually succeeded, *in the higher courts*, in setting aside a price ceiling or in invalidating either the formula by which the price was arrived at or the date on which the price of commodities or services was frozen. See cases under Notes 7, 11 and 19. And see the language of Mr. Justice Douglas in Bowles v. Willingham, 1944, 321 U.S. 503, 519, 64 S.Ct. 641, 88 L.Ed. 892. Montgomery Ward & Co. v. Bowles, 1944, Em.App., 147 F.2d 858, is the proverbial "exception which proves the rule". The price regulation was set aside because it discriminated between equals. But inequalities which may result in individual cases from uniform application of a rule to a group do not impinge upon any constitutional requirement.

tion in the manner in which it was done in this case. To encourage the third alternative, provision was made for disposing of substandard raisins or grapes not suitable for conversion into raisins, and of excess raisins. The plaintiffs chose the third alternative. Having done so, they are not in a position to complain that the choice amounted to compulsion. There was nothing to prevent them from disposing of them under the first two alternatives. It is true that the price was fixed. But the price fixing was not an incident to this contract. *It was an incident of the war.* And neither the growers nor anyone else could avoid price control because that policy was adopted by the Congress of the United States in its attempt to control inflation of the type which plagued us during and after the First World War.[31] Of course, the program was a limitation of choice. But every program of control of a commodity, even in peace time, involves some restrictions on the free acts of the individual in disposing of his product.[32] So, if a detriment resulted to the grower from this limitation of free action, it was a consequence of the exercise of the war powers. These do not constitute duress in the legal sense, which would warrant the repudiation of a program voluntarily entered into and the benefits of which the growers later accepted.[33]

Hence the conclusion that the contract under consideration called for a single pool of all the surplus derived from the resale of all varieties of grapes, that it was valid, did not deprive the plaintiffs of due process, was accepted by them and they are not now in a position, even if doubt existed as to its validity, to repudiate it, having entered into it voluntarily and accepted some of its benefits.

Judgment and declaration will be for the defendant in accordance with the views here expressed. The full terms of the judgment are contained in an order filed simultaneously.

[31] Yakus v. United States, 1944, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834.

[32] Parker v. Brown, 1943, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315; Edwards v. United States, 1941, 9 Cir., 123 F.2d 465; Wickard v. Filburn, 1942, 317 U.S. 111, especially 130, 131, 63 S.Ct. 82, 87 L.Ed. 122; Bowles v. Willingham, 1944, 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892; L. B. Steuart & Bros. v. Bowles, 1944, 322 U.S. 398, 64 S.Ct. 1097, 88 L.Ed. 1350.

[33] All phases of the argument,—including the more detailed analyses as to the working of the program made by both sides, —were studied and given thought to. However, in the preparation of the opinion, I have sought to confine myself to what I considered the fundamental legal questions involved and only such facts were included as bore on them. At that, the opinion is of more than the usual length. The proposed order for judgment covers, in detail, every possible fact and conclusion which need be incorporated into the findings and judgment.